ESTATE OF Jeffrey FORD; Eva Ford, individually and in her capacity as Administrator of the Estate of Jeffrey Ford; Thomas Ray Ford, Plaintiffs–Appellees,

v.

Ana M. RAMIREZ–PALMER, Defendant,

and

Edward Caden; Eric Arnold; Robert Williams, Defendants–Appellants.

No. 01–15769.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 11, 2002.

Filed Aug. 23, 2002.

J. Scott Smith, Angelo, Kilday & Kilduff, Sacramento, CA, for the defendants-appellants.

Stan Casper, Casper, Meadows & Schwartz, Walnut Creek, CA, and John Houston Scott, Prentice & Scott, San Francisco, CA, for the plaintiff-appellee.

Before: CANBY and RYMER, Circuit Judges, and BERTELSMAN,* Senior District Judge.

Opinion by Judge RYMER; Partial Dissent by Judge CANBY.

RYMER, Circuit Judge.

This appeal raises the question of whether, after *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), qualified immunity may be denied in an Eighth Amendment case solely because there is triable issue of fact as to whether a prison official was deliberately indifferent to an inmate's safety.

Jeffrey Ford, an inmate at the California Medical Facility–Vacaville (CMF), was killed by his cellmate James Diesso while they were housed in the CMF Psychiatric Administrative Segregation Unit (PAS). Ford's family and Estate brought an action under 42 U.S.C. § 1983 against the State of California and a number of prison officials, including Associate Warden Edward Caden for allowing Diesso to be double-celled, and Correctional Lieutenant Eric Arnold and Correctional Sergeant Robert Williams for allowing Ford to be double-celled with Diesso.[1] Caden, Arnold and Williams moved for summary judgment on their defense of qualified immunity. We held in *Hamilton v. Endell*, 981 F.2d 1062 (9th Cir.1992), that a finding of deliberate indifference (or of a triable issue as to it) necessarily precludes a finding of qualified immunity. Relying on *Hamilton*,

and deciding the issue before *Saucier*, the district court denied the motion because it found that there were triable issues of fact whether each was deliberately indifferent to a substantial risk of serious harm.

The correctional officers appeal, arguing that *Saucier* requires an additional inquiry into whether a reasonable officer would have understood that his decision was impermissible under the Eighth Amendment. We agree, and hold that *Hamilton* was undermined by *Saucier*. Even though the constitutional issue turns on the officers' state of mind (here, deliberate indifference to a substantial risk of serious harm), courts must still consider whether—assuming the facts in the injured party's favor—it would be clear to a reasonable officer that his conduct was unlawful. As the district court's analysis stopped short of this step, we complete it and conclude that Caden, Arnold and Williams are entitled to qualified immunity. The information available to them did not make it so clear that Diesso would harm Ford that no reasonable officer could have agreed to allow them to be celled together. We therefore reverse.

I

The material facts as to the correctional officers' conduct are essentially undisputed. To the extent there is a dispute, we recite them in the light most favorable to the Fords.

CMF housed approximately 3,100 inmates at the time the events in this case occurred, most in need of medical or psychiatric services.[2] Inmates were housed in different units depending upon the level of psychiatric care required. Administrative

---

* The Honorable William O. Bertelsman, Senior United States District Judge for the Eastern District of Kentucky, sitting by designation.

**1.** All named defendants but Caden, Arnold and Williams were dismissed and no appeal is taken as to them.

**2.** Since 1989, CMF has been operated under a consent decree entered in *Gates v. Deukmejian*, 1988 WL 92568 (E.D.Cal. No. CIVS–87–1636).

Segregation Units (ASU) were used for inmates who required removal from the general population because of safety or security concerns. PAS was one of three ASU units; it had 38 cells, 36 of which were equipped to house two inmates. In addition to ASUs, CMF also maintained a psychiatric observation unit known as S–3. It had 18 cells and served as housing for suicidal inmates or inmates whose behavior was so significantly out of control that it posed an extreme danger to themselves or others.

The broadest classification for inmates receiving psychiatric care was "J." Category "J" inmates were considered sufficiently mentally ill that they could not be housed in the general population, but were generally medication-compliant. Classifications were made by the Institution Classification Committee (ICC). An inmate who ICC determined could be double celled safely had a "D" suffix designation; when it was determined that an individual inmate could not be double-celled safely, he was given an "S" suffix. A unit lieutenant had authority to order an inmate single-celled before an ICC hearing could be convened.[3] Inmates could also ask to be double-celled together by signing a "CDC 128–B" form. The decision whether two inmates could be celled together was made by the unit's housing sergeant or lieutenant.

The sergeant or lieutenant making a decision to double-cell particular inmates was supposed to review the inmate's central file (which showed known enemies and disciplinary history), the "victim predator" list (which was maintained by each unit office and showed whether an inmate was a "victim" or "predator"), and the "CDC 114A" form (which provided a chronology of the inmate's most recent ASU history). An inmate was designated as a "predator" if he had a history of physical assaults on staff or inmates, use of a deadly weapon, inciting disturbances, sexual offenses, or a pattern of predatory or manipulative behavior. CMF policy precluded housing a designated "victim" with a "predator," but permitted housing a "predator" with an inmate who was not designated as a "victim."

Diesso, who was a category J inmate, was first placed in the PAS unit at the end of January 1997 after stabbing another inmate (evidently an effeminate homosexual) 17 times with a makeshift knife because that inmate had threatened to expose Diesso as a homosexual. Diesso was characterized as "extremely violent and dangerous" and was designated a "predator" as early as January 1995. He was involved in a number of attacks on guards or other inmates between 1993 and 1997, and, after assignment to PAS, in additional violent altercations with another inmate on January 30, 1997, a peace officer on May 20, 1997, and other inmates on July 22, 1997, January 3, 1998, and May 21, 1998. Diesso had been double-celled without problems with other inmates, including those known to staff to be homosexual, and with Ford. Ford was also a category J inmate, who was widely known to PAS staff as an effeminate homosexual. Diesso was not outwardly homosexual, but he was reputed to engage in homosexual behavior, and often requested to be celled with known homosexuals.[4]

---

3. In making a classification determination, the ICC considered assaultive behavior toward a cell mate; sexual abuse of a cell mate; in-cell violence or violence against a dormitory partner; whether there was a list of known enemies; health and medical issues; physical disabilities; disciplinary history; the relationship between misconduct and mental health issues; the level of the inmate's mental care; and the opinion of mental health staff.

4. An Internal Affairs investigation report prepared after Ford's murder indicates that Diesso was a member of the "Nazi Low-riders,"

On June 6, 1998 Diesso was celled with inmate Deckard, also a "predator" and a much larger man than Diesso. Correctional Officer Matthew Sanchez found Diesso wearing home-made knee pads, elbow pads, and a headband, saying "Get Deckard out of here" and "They've taken me off my meds." Sanchez confirmed that Diesso had been taken off his medication, and removed him from the cell. Sanchez testified that he wrote an "S" on Diesso's 114A form, and on the grease-wipe "housing board." The 114A for June 6 indicates that Diesso was "acting strange" and was prescribed temporary medication. The June 7 form 114A indicates that Diesso was "banging on door" and asking to see the doctor for more medication. Neither form has an "S" entry. On June 8 Diesso was taken to the S 3 unit for observation. He was returned to PAS on June 19, where he was double-celled with inmate Nobles.

Meanwhile, on June 9 Diesso had been approved for transfer to a special handling unit at Corcoran State Prison which is reserved for extremely dangerous inmates. On June 23, he appeared before the ICC, which Caden chaired, for a 30–day review. The ICC decided to retain Diesso in PAS pending his transfer, and left Diesso's "D" suffix (for double-celling) designation in place.

At some point after Diesso's return to PAS, Sanchez and Correctional Sergeant Todd Wasco became aware that Diesso wanted to cell with Ford but did not allow it to happen. On June 26, 1998, Arnold (then a new correctional lieutenant for PAS) was on duty and was told by another correctional officer that Ford was not getting along with his cellmate. He was also told that Ford and Diesso had previously

been celled together without incident. Arnold talked to Williams, who had been a housing sergeant in PAS since August 1997. Williams asked another officer to canvass the unit to find someone who would be willing to move. The officer told Williams that Ford and Diesso were willing to be celled together and that Ford's cellmate was willing to cell with Nobles. Williams was familiar with both Ford and Diesso, knew that Diesso was classified as a "predator" but Ford was not classified as a "victim," and had recently reviewed the central files for both inmates. He told Arnold that Diesso and Ford were not enemies, did not have any gang-related conflict with each other, and that he approved the transfer. Ford and Diesso signed CDC 128–B forms dated June 26, 1998 requesting to be double-celled with each other. Arnold authorized the transfer of Ford to Diesso's cell.

On June 27, Arnold presided over a disciplinary hearing involving Diesso which arose out of a fight between Diesso and another inmate on May 21. A report that Arnold saw during that proceeding indicated that Diesso had said he thought the other inmate was up to something so "I just snapped."

Ford was transferred to Diesso's cell on the 27th. During the early morning hours of June 29, Diesso attacked and killed Ford. Ford suffered blunt force trauma to the head, abrasions and lacerations on the face, lacerations on his legs and back, and ligature strangulation. The walls of the cell were covered with bloody handprints and smears, and the words "die demon" were written in blood on one wall.

The Estate of Jeffrey Ford, Eva Ford individually and as administrator of the

---

which apparently encouraged violence against homosexuals but was not a recognized prison gang as of June 1998. The parties dispute the extent to which CMF staff was

aware of any such affiliation. Diesso's 114A forms show a gang association of "Sureno," and his central file shows him belonging to a "white supremacist" gang as of May 1998.

Estate, and Tommy Ray Ford (to whom we refer collectively "the Fords") alleged a number of causes of action against a number of officials that were ultimately dismissed, leaving the claim that Caden, Arnold and Williams violated Ford's right to be free from cruel and unusual punishment under the Eighth Amendment. Each moved for summary judgment on qualified immunity. The district court concluded that genuine issues of material fact exist as to whether Caden knew about Diesso's extensive history of violent behavior towards inmates and staff, knew that Diesso had acted bizarrely and aggressively toward his cellmate on June 6, 1998, and knew that Sanchez had noted in Diesso's file that Diesso should be single-celled. It held that Arnold had not shown either that he investigated whether Diesso and Ford should have been celled together, or that he believed his subordinates had done so. The court found that Williams had not shown the absence of an issue of fact as to whether he was deliberately indifferent to a substantial risk of harm to Ford when he advised Arnold that Diesso and Ford be allowed to cell together. Accordingly, it denied qualified immunity.

Caden, Arnold and Williams timely appealed.

## II

■ The Fords first challenge our jurisdiction because in their view the appeal essentially challenges the sufficiency of the evidence to support inferences that Caden, Arnold and Williams had actual knowledge of the substantial risk of serious harm from housing Diesso with Ford. We disagree that there is any jurisdictional problem. To the extent that the officers contest sufficiency of the evidence, it is alternative to their principal argument that *Saucier* controls and that, conceding all factual disputes identified by the Fords, it cannot be said that a reasonable officer would understand there was such a

clear likelihood Diesso would attack Ford that allowing the two to be double-celled was constitutionally impermissible. In any event, we may decide whether there is a material dispute about the correctional officers' conduct, and if so, assume those facts in the Fords' favor in order to determine whether the denial of qualified immunity was appropriate. *Jeffers v. Gomez*, 267 F.3d 895, 903 (9th Cir.2001).

## III

Whether the denial of qualified immunity was appropriate in this case turns on whether *Hamilton* remains good law in light of *Saucier*. In *Hamilton*, a prisoner alleged that officials were deliberately indifferent to his serious medical needs; the prison officials sought summary judgment on the basis of qualified immunity. The district court denied summary judgment and we upheld it because triable issues existed as to whether the officials were deliberately indifferent. In doing so, we stated: "A finding of deliberate indifference necessarily precludes a finding of qualified immunity; prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law. In order to determine whether summary judgment was properly denied, we need only determine whether the plaintiff established a genuine issue of material fact as to whether the defendant prison officials were deliberately indifferent to his medical needs." *Hamilton*, 981 F.2d at 1066 (citation omitted).

In *Saucier*, the claim involved excessive use of force in making an arrest; the arresting officer asserted qualified immunity; and this court held that summary judgment based on qualified immunity was inappropriate because the constitutional inquiry—whether unreasonable force was

used in making the arrest—and the inquiry on qualified immunity were the same. We reasoned that both concern the objective reasonableness of the officer's conduct in light of the circumstances that he confronted. The Supreme Court reversed, observing that the goal of qualified immunity would be undermined if summary judgment were denied every time a material issue of fact remains on an excessive force claim. *Saucier,* 533 U.S. at 202.

*Saucier*'s key point is that the qualified immunity inquiry is separate from the constitutional inquiry. In the Fourth Amendment context, the Supreme Court rejected the view that the inquiries merge because a reasonable officer could not possibly think it was reasonable, *i.e.,* lawful, to use unreasonable force. The Fords make essentially the same argument in the Eighth Amendment context, that a reasonable officer could not possibly think it was reasonable, *i.e.,* lawful, to be deliberately indifferent to a substantial risk of serious harm. However, it is no less true for purposes of the Eighth Amendment than it was in *Saucier* that the qualified immunity inquiry "has a further dimension." *Id.* at 205; *see Hope v. Pelzer,* — U.S. —, — – —, 122 S.Ct. 2508, 2513–16, 153 L.Ed.2d 666 (2002) (applying *Saucier* in an Eighth Amendment case and separately analyzing the qualified immunity and constitutional inquiries). "The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier,* 533 U.S. at 205. The Court emphasized that it is often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces. This is why "all but the plainly incompetent or those who knowingly violate the law" have immunity from suit; officers can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation. *Id.* at 202 (quoting *Malley v.*

*Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)); *see Jeffers,* 267 F.3d at 909 (noting in Eighth Amendment case that in *Saucier* "the Court emphasized the broad discretion that must be afforded to police officers who face tense situations, and the importance of granting immunity even when officers make mistakes").

Caden, Arnold and Williams contend that *Saucier*'s rationale applies here because for a prudent prison official to be able to determine whether the Eighth Amendment compels him to take particular action to protect an inmate, he must not only know the facts giving rise to a risk but must also be able to determine whether the level of risk is "substantial." This, they submit, is inherently nebulous. The Fords counter that Eighth Amendment claims are different, because Fourth Amendment excessive force claims are determined by a purely objective test of reasonableness while the plaintiff in the Eighth Amendment context must also establish that a prison official had the requisite state of mind of deliberate indifference. For this reason, they argue, even if *Saucier* applies, the question remains whether a reasonable prison official could have believed it would be lawful consciously to disregard the substantial risk of harm posed by double-celling Diesso with Ford.

■ While Eighth Amendment claims depend in part on a subjective test that does not fit easily with the qualified immunity inquiry, there is an objective component as well. To violate the Eighth Amendment, the deprivation alleged must *objectively* be sufficiently serious; and the prison official must *subjectively* have a sufficiently culpable state of mind. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). For claims challenging conditions of confinement, the state of mind is deliberate indifference to

inmate safety. *Id.* "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity. *Saucier,* 533 U.S. at 205.

Accordingly, we conclude that *Hamilton,* which collapses the deliberate indifference part of the constitutional inquiry into the qualified immunity inquiry, has been undermined by *Saucier.* Instead, courts must follow the *Saucier* framework. We turn to it now.

## IV

 As a threshold matter we take the facts in the light most favorable to the Fords, and ask whether those facts show that the officers' conduct violated a constitutional right. *Saucier,* 533 U.S. at 201. We do not assume that Caden, Arnold or Williams acted with deliberate indifference, as that would assume the answer. However, if any of the officers knew that Diesso was acting out dangerously with cellmates or that he was a threat to Ford but housed Ford with him anyway, this would violate the Eighth Amendment. The correctional officers do not argue other-

wise, for there is no question that this conduct would touch all the bases established in *Farmer.*[5]

 The next question is whether the constitutional right that would be violated was clearly established. This is "a two-part inquiry: (1) Was the law governing the state official's conduct clearly established? (2) Under that law could a reasonable state official have believed his conduct was lawful?" *Jeffers,* 267 F.3d at 910 (quoting *Browning v. Vernon,* 44 F.3d 818, 822 (9th Cir.1995)). However, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

The parties agree that the Supreme Court settled the law in *Farmer.* So, before the decision to double cell Ford with Diesso was made, it would have been clear to a reasonable prison official that if he knew about an excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he would violate the law by disregarding it. He would also have known that merely being negligent, or failing to alleviate a significant risk that he should have perceived but did not, is not constitutionally deficient conduct. *Farmer,* 511 U.S. at 835, 838.

At the same time, the Court has emphasized that determining whether the law was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201. Therefore, it is not sufficient that *Farmer* clearly states the general rule that prison officials cannot

---

**5.** The Fords also point out that we held in *Redman v. County of San Diego,* 942 F.2d 1435 (9th Cir.1991), that prison officials violated the Eighth Amendment by housing an aggressive homosexual with a "young and

tender" heterosexual male. Caden, Arnold and Williams recognize their duty under *Redman,* but note that the Fords make no allegations that implicate a *Redman* scenario.

deliberately disregard a substantial risk of serious harm to an inmate; here, in addition, it is relevant that neither *Farmer* nor subsequent authorities has fleshed out "at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes." *Farmer*, 511 U.S. at 834 n. 3; *cf. Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (indicating in second-hand smoke case that a risk is intolerable under the Eighth Amendment when it violates contemporary standards of decency to expose anyone unwillingly to it). Thus, it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm. *Farmer* left that an open issue. This necessarily informs "the dispositive question" of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that Caden, Arnold and Williams confronted.

Although Caden's decision to continue Diesso as a "D" designation, and Arnold's approval upon Williams's advice to allow Diesso to be double-celled with Ford turned out be quite unfortunate judgments, we cannot say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling.

### A

■ Viewing the evidence in the light most favorable to the Fords, when Caden chaired the ICC review of Diesso's classification status on June 23, 1998 he was aware that Diesso had an extensive history of violent behavior toward inmates and staff, including eleven separate assaults, one of which involved stabbing an inmate seventeen times; that Diesso was classified as a "level four" inmate—the highest security level—and had a "point total" that made him one of the highest security inmates at CMF; that Diesso was classified as a "predator"; that Diesso had acted bizarrely and aggressively towards his cellmate on June 6, 1998, threatening to attack him but apparently failing to do so because his cellmate was approximately twice his size; that after this incident housing Lieutenant Sanchez thought that Diesso should be single-celled; that Diesso was going to be transferred to a special handling unit at Corcoran State Prison, which is reserved for extremely dangerous inmates; and that single cells were available to house Diesso while he awaited his transfer to Corcoran. At the same time, Caden would have been aware that Diesso had been successfully double-celled for years with other inmates (including effeminate homosexuals upon occasion) with no problems prior to the June 6, 1998 incident; that while Diesso was off his medications when the June 6 incident occurred, he had been put back on them; and that at the time of the June 23, 1998 ICC meeting Diesso had been double-celled with Nobles for three days without incident.

In these circumstances we cannot say that a reasonable officer in Caden's position would necessarily have perceived that continuing Diesso's "D" designation exposed any approved cellmate to an excessive risk of serious harm. Caden was not involved in the discrete decision to house Ford with Diesso, therefore he can only be responsible for the ICC's decision to continue Diesso's "D" designation. Double-celling as such is not constitutionally impermissible. *Rhodes v. Chapman*, 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Given that Diesso had been under observation in the S–3 unit for two weeks since the June 6 incident and Sanchez's notation, had been returned on medications to PAS without any recommendation for single-celling from the S–3 staff, and had been housed safely with Nobles

for several days, we cannot say that a reasonable officer would perceive that the risk of continuing to double-cell Diesso was so high as to be constitutionally impermissible.

### B

■ Arnold had recently been transferred to PAS and relied on Williams, who knew both Ford and Diesso. Williams told Arnold that he approved of the request by Diesso and Ford to be celled together and that he believed Diesso and Ford were not enemies, did not have a gang-related conflict, and were not a "predator" and "victim" combination. Arnold also knew that Ford and Diesso had previously celled together without incident. However, Arnold did not review either inmate's central file or, viewing the evidence in the light most favorable to the Fords, Diesso's 114A forms. Failure to follow prison procedures, which called for doing so before making a housing decision, was certainly negligent; but negligence, or failure to avoid a significant risk that should be perceived but wasn't, "cannot be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838. Arnold was aware that Diesso had "snapped" and attacked another inmate in the yard in mid-May 1998, but otherwise had little if any knowledge of Diesso's extensive history of violence towards inmates and guards. Based on the information before him, Arnold had little reason to think that Diesso was excessively dangerous or that he posed any particular danger to Ford. For all that appeared, Ford was *safer* for Diesso to be celled with than anyone else as they had been celled together before without a problem, and both wanted to be celled together again.

Ford contends that Arnold should nonetheless be denied qualified immunity because a reasonable officer in his situation would at least have suspected that Diesso posed a serious risk, and Arnold failed properly to investigate that risk. In

*Farmer*, the Supreme Court noted that a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n. 8. However, a reasonable officer in Arnold's position would not necessarily have suspected that celling Ford with Diesso posed an excessive or intolerable risk of serious injury. *See id.* at 847 n. 9 (observing that if the evidence establishes that an inmate faces "an objectively intolerable risk of serious injury," the defendants could not plausibly persist in claiming lack of awareness). To the contrary, the evidence does not show that Ford faced an intolerable risk as the two had celled together before and requested to do so again, nor does it show that a reasonable correctional officer would have believed otherwise.

Even if Arnold had checked the files that he was supposed to check, he would not have uncovered evidence that would have made him aware of a substantial risk of serious harm. While the evidence in Diesso's central file showed that he had an extensive history of violent behavior and was being transferred to a higher security prison, it also showed that he had only acted aggressively towards a cellmate on one occasion (June 6, 1998), that he had been off his medications on that occasion, and that he had subsequently been put back on them. Neither would anything in the record have shown Arnold that Diesso was a member of a gang that wanted to attack homosexuals. In short, failure to review the files, while no doubt negligent, does not itself show that a reasonable officer in Arnold's position would strongly suspect a serious risk.

### C

■ Williams had reviewed Diesso's file "recently" and was aware of Diesso's

history of violence and aggressive behavior toward a cellmate when off medications, and knew that Ford and Diesso had previously celled together without any problems, had requested to cell together on this occasion, were not enemies, did not have a gang-related conflict, and were not "predator" and "victim." A reasonable officer could have thought that Diesso did not pose a substantial or intolerable risk to Ford in these circumstances. Finally, the Fords' reliance on Williams's failure to re-review the central files and the 114A forms does not convert his approval of double-celling Diesso and Ford into conduct that no reasonable correctional officer would have undertaken.

V

We hold that *Hamilton*'s approach must give way to *Saucier*'s in Eighth Amendment cases. Courts may not simply stop with a determination that a triable issue of fact exists as to whether prison officials were deliberately indifferent; instead, the qualified immunity inquiry is separate from the constitutional inquiry, and courts must undertake the qualified immunity analysis separately. Having done so, we conclude that Caden, Arnold and Williams are entitled to qualified immunity because it would not have been clear to a reasonable correctional officer knowing what each knew (viewed in the light most favorable to the Fords) that double-celling Diesso, or double-celling him with Ford, posed such a substantial risk of serious harm that doing so would be constitutionally impermissible.[6]

REVERSED.

CANBY, Circuit Judge, dissenting in part:

I agree with Judge Rymer's well-crafted opinion in most respects. Specifically, I

agree that *Saucier* requires a two-step analysis of qualified immunity in this Eighth Amendment case. I also agree that, given Diesso's classification as appropriate for double-celling, reasonable officers in the position of Arnold and Williams would not have known that double-celling Ford with Diesso would violate Ford's Eighth Amendment rights.

My disagreement is over the decision by Caden to continue Diesso's classification as "D"—appropriate for double celling. Judge Rymer's opinion scrupulously sets forth Diesso's extraordinary history of violence. It also accurately recites that Caden knew of that history, knew that Diesso was given the highest classification of dangerousness, knew of recent incidents and that they had caused Lieutenant Sanchez to note that Diesso should be changed to a single-cell category. Without my repeating all the details so clearly set forth by Judge Rymer, it is sufficient to say that I am convinced that a reasonable officer in Caden's position would have known that the double-celling classification of Diesso exposed any future cellmate to an excessive risk of serious harm, and that deliberately incurring this risk would violate that cellmate's Eighth Amendment rights under the principles established by the Supreme Court in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). *See Hope v. Pelzer,* —— U.S. ——, ——, 122 S.Ct. 2508, 2515, 153 L.Ed.2d 666 (2002) (facts of precedential case need not be "materially similar" to those of case in issue; it is sufficient that pre-existing law makes apparent the unlawfulness of conduct in question).

Accordingly, I would affirm the district court's denial of qualified immunity for Caden and would remand the matter for trial of the claim against him. In all other

---

**6.** Given this disposition, we need not reach the officers' alternative argument that the evidence is insufficient to establish that any of them had a sufficiently culpable state of mind.

respects I concur in Judge Rymer's opinion.