**Daniel MOORING, Plaintiff,**

v.

**SAN FRANCISCO SHERIFF'S DEPARTMENT; et al., Defendants.**

**No. C 03–065 SI(PR).**

United States District Court, N.D. California.

Oct. 31, 2003.

Daniel M. Mooring, CJ–SF II, San Francisco, CA, for plaintiff.

Ingrid M. Evans, City Attorney's Office, City & County of San Francisco, San Francisco, CA, for defendants.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ILLSTON, District Judge.

### INTRODUCTION

Daniel Mooring, an inmate currently housed at the San Francisco County Jail, filed this *pro se* civil rights action under 42 U.S.C. § 1983. Defendant now moves for summary judgment, arguing that plaintiff has not exhausted his administrative remedies, and that defendant is entitled to judgment as a matter of law on plaintiff's deliberate indifference claim and on the defense of qualified immunity. For the reasons discussed below, the court concludes that defendant is entitled to judgment as a matter of law on plaintiff's complaint and on his defense of qualified immunity. Accordingly, the court will grant defendant's motion for summary judgment.

### BACKGROUND

This civil rights action concerns an incident that occurred on May 23, 2002, when Daniel Mooring allegedly was housed unwillingly with gang rivals and was shortly thereafter assaulted by them. The following facts are undisputed unless otherwise noted.

On May 23, 2002, Mooring was incarcerated at the San Francisco County Jail as a pretrial detainee. The lone remaining defendant, Rene Gonzalez, was a San Francisco County Sheriff's deputy working in the jail.

Generally, housing assignments at the jail are based on two factors. Inmates are first separated by danger level, with dangerous inmates housed together. Second, inmates who claim a particular gang affiliation or identify other enemies will be kept in different cells. A new housing assignment is given if an inmate is a disciplinary problem in a specific cell or if an inmate has problems with other inmates in a cell.

In order to prevent an inmate from manipulating the system to get his choice of cell without an adequate basis, the inmate must state if a specific inmate is causing him problems. General complaints by an inmate will not result in a new housing assignment for him.

Gonzalez recognizes that some gangs are incompatible in jail. At the time of the incident, "it was known that Norteno gang members should not be celled with Soreno gang members. Generally, Norteno gang members were housed in cell F and Soreno gang members were housed in cells D and E." Gonzalez Decl., ¶ 7. If he "knew that Mooring was a member of the Norteno gang, [he] would not have put [Mooring] in cell E." *Id.* at ¶ 15.

A "field arrest card" contains many different pieces of information about the inmate, including a notation of gang affiliation at the county jail. The field arrest card appears to be a multi-page document filled out when the prisoner is first arrested and updated throughout his stay with notations of certain events relating to his custody in the county jail. Thus, the first page has boxes for the arrestee's name, address, race, sex, date of birth, case numbers, medical treatment, and charges for which he was arrested. The first page also includes boxes for dates and housing locations in the jail. The next pages provide room for notes about the inmate's custodial status, movement of the inmate to administrative segregation and the general population, complaints by the inmate, misbehavior by the inmate, issuance of rule violation reports, and the dates on which the various events occurred. The "field arrest card" may be first started at the time of arrest but is updated throughout the prisoner's stay in the county jail.

Mooring's field arrest card contains the following entries of note: Moore was arrested on April 26, 2001. An April 26,

2001, entry states that Mooring "claims no gng affl. but last time in custody claimed Hunter's Point '415' 'Miko'." *See* Evans Decl., Exh. C; Gonzalez Decl. unnumbered exhibit. There are numerous entries for misbehavior and rule violations throughout the following years—apparently Mooring was in custody from April 2001 through the time the summary judgment motion was filed. A November 5, 2001 entry states that the writer "received info that Mooring was in danger @ CJ # 2." A May 20, 2002 entry states that "inmate Mooring refused Deputy William's orders to lock up during count / Inmate continues to be disruptive in G.P. housing / Ad seg per Sgt. Tilton." A May 23, 2002 entry directs: "remove from ad seg. and house in G.P. housing per Sgt. Tilton. Already attempting to be moved to 'F' (moved to 'E' instead)." A May 24, 2002 entry states that "inmate Mooring was involved in a fight with inmate Augustin Flores ... in E–Tank / inmate Mooring was very evasive and vague as to his housing restrictions and came across to staff as manipulating housing."

Mooring stated in his deposition that he saw his housing card at some point and it had an "N" on it to signal the gang he was in and that he therefore could not be put in cells D and E where the jail housed the Sorenos (an opposing gang). Evans Decl., Exh. A, p. 21. Mooring did not state in the deposition transcript submitted that the "N" stood for Norteno and did not state when that "N" was put on the field arrest card. The field arrest card submitted by defendants has a big "N" roughly in the area where medical treatment is to be noted on the first page.

On the morning of May 23, 2002, Gonzalez was assigned to move Mooring from administrative segregation in cell G[1] back to a cell in the general population. Mooring had been placed in administrative segregation because of the disciplinary problems involving Mooring in cell F and Gonzalez was given specific instructions from his supervising sergeant not to return Mooring back to cell F. The following sequence of events occurred: (1) Gonzalez tried to put Mooring in cell D and quickly removed him when Mooring objected, (2) Gonzalez returned Mooring to an ad seg cell, (3) a short period of time passed while (a) Mooring talked to Sgt. Tilton (according to Gonzalez) or (b) Gonzalez went away and returned twenty minutes later (according to Mooring), (4) Gonzalez put Mooring in cell E over Mooring's protest, and (5) within 15–60 minutes, Mooring was fighting with or being attacked by his new cellmates. The parties disagree slightly about the communications between them during these events.

Gonzalez states that, in response to his inquiry, Mooring said he didn't want to be put in cell D because he did not get along with "those people" and would not identify the particular problem inmates. After Mooring spoke with Sgt. Tilton, Tilton told Gonzalez to move Mooring to cell E. Mooring objected to placement in cell E but would not explain why he needed to be placed in a different cell. Gonzalez put him in cell E and observed Mooring for a few minutes, during which time Mooring did not appear to have any problems with other inmates in cell E. Gonzalez does not state whether he looked at Mooring's field arrest card before he moved him to cell E.

Mooring states in his verified complaint that when he was due to be moved back to general population on May 23: "I informed deputy Gonzalez # 1441 that I was gang

---

1. The lettered cells also are occasionally referred to as "tanks" in the materials before the court. The lettered cells apparently held more than a couple of inmates, although the exact number is not stated in the materials before the court.

relate classification and that it was shown on my classification record. I was informed I would be housed in the tank. I imformed [sic] the deputy I could not be places [sic] in that tank because of my gang relations. He said I would have to go into that cell anyway." Complaint, p. 3. In his response to an interrogatory, Mooring states: "But before I left told deputy Gonzalez # 1441 that I was gang affiliated. He then told that he check my housing card. He still told me to roll the belongings I had." Evans Decl., Exh. E, response to interrogatory 3. Mooring states that when he was going to be put in E cell, "I told him I know you look at my card. Yes was the answer he gave me. He open the door and I went in." *Id.; see also* Evans Decl., Exh. A at p. 21–22.

There is no evidence that Mooring actually told Gonzalez which specific gang he was in. There is no evidence that Gonzalez knew Mooring was in danger from the Sorenos in cell E. There is no evidence in the record that Gonzalez knew that Mooring was in the Norteno gang on May 23, 2002.

The San Francisco Sheriff's Department does not have a record of a grievance from Mooring concerning his placement in cell E on May 23, 2002. The parties have not described the administrative grievance/appeal process or described the steps that must be taken to exhaust administrative remedies at the jail.

### VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred in San Francisco County, which is located within the Northern District. This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

### LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.")

Generally, as is the situation with defendants' challenge to the Eighth Amendment claim, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citations omitted).

Where, as is the situation with a qualified immunity defense, the moving party bears the burden of proof at trial and must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992). He must establish the absence of a genuine issue of fact on each

issue material to his affirmative defense. *Id.* at 1537; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

■ A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn. 10–11 (9th Cir.1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, the court will consider as evidence Mooring's verified complaint.[2]

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

## DISCUSSION

### A. Exhaustion of Administrative Remedies

■ Gonzalez argues that he is entitled to summary judgment because Mooring had not exhausted administrative remedies before filing this action as required by 42 U.S.C. § 1997e. Summary judgment cannot be granted on this ground because Gonzalez does not present proof concerning the San Francisco County Jail administrative grievance system. Without knowing what is necessary to exhaust administrative remedies within that system, the court cannot determine whether Mooring did it. Gonzalez' recitation of the steps necessary to exhaust under the California Department of Corrections system does not establish the steps necessary to exhaust in the separate San Francisco County Jail system.

### B. Deliberate Indifference Claim

■ The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials take reasonable measures for the safety of inmates. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In particular, officials have a duty to protect inmates from violence at the hands of other inmates. *See id.* at 833, 114 S.Ct. 1970. A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indif-

---

**2.** The court does not consider the "Supplemental Motion In Opposition To Summary Judgment" because that brief was filed by Kevin MacGregor and not by plaintiff. The filing flatly ignores the court's previous direction to Mooring that "the named plaintiff (and not any other prisoner) is responsible for the filings made on his behalf in an action and the plaintiff must sign all documents filed on the plaintiff's behalf in this action; the court will not accept any documents on a *pro se* prisoner's behalf that were not signed by that prisoner." May 16, 2003 Order, pp. 2–3. Even if the court did consider the declaration attached to the "supplemental motion," Mooring would not survive summary judgment because the Thorn declaration does not establish that Thorn had personal knowledge that Gonzalez knew that putting Mooring in cell E would endanger his safety.

ferent to the inmate's safety. *See id.* at 834, 114 S.Ct. 1970.

■ To be liable in a failure to prevent harm situation, the official must know of and disregard an excessive risk to inmate safety. *See id.* at 837, 114 S.Ct. 1970. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *See id.* He need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault." *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir.1986). Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur. *See id.; see, e.g., id.* at 460 (summary judgment appropriate as to defendants when plaintiff "failed to come forward with any facts showing that these defendants had any reason to believe he would be attacked by the assailant").

■ Mooring had the status of a pretrial detainee at the time of the incident. As a pretrial detainee (rather than a convict), he was not protected by the Eighth Amendment's proscription against cruel and unusual punishment, but instead was protected from punishment without due process under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *See Bell v. Wolfish,* 441 U.S. 520, 535–36 & n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Even though his claim arises under the Due Process Clause, the Eighth Amendment serves as a benchmark for evaluating the claim. *See Carnell v. Grimm,* 74 F.3d 977, 979 (9th Cir.1996); *Redman v. County of San Diego,* 942 F.2d 1435, 1443 (9th Cir.1991), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992).

■ When, as here, the inmate seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988). *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." *Id.* In the former case, a broader and more generalized approach to causation is taken. *See id.*

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant.... Sweeping conclusory allegations will not suffice to prevent summary judgment.... The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id.* at 633–34 (citations omitted).

■ Mooring has failed to raise a triable issue of fact that Gonzalez was deliberately indifferent to his safety. Mooring needed to raise a triable issue of fact that Gonzalez knew that housing him in cell E would result in a substantial risk of serious harm. He did not do so. Even assuming that an inmate's membership in the Norteno gang made housing him with a member of the Soreno gang inherently and unacceptably dangerous, that would only establish the objective prong of the analysis, i.e., that there was a substantial risk of

serious harm. It does not address subjective prong, which requires that the defendant know of and disregard that risk. Mooring has not raised a triable issue of fact that Gonzalez knew that Mooring was in the Norteno gang when he put him in cell E. There is no evidence that Mooring told Gonzalez that he was in the Norteno gang on or before the move on May 23, 2002.

The field arrest card does not show the requisite state of mind for Gonzalez. The field arrest card had an "N" prominently marked on the first page but Mooring offered no evidence to show when that "N" was written on the field arrest card. Because the document was updated throughout Mooring's stay in the jail that lasted from April 2001 throughout at least July 2003, the reader must speculate when the "N" was put on the card as well as what it means. Gonzalez states in his declaration that Mooring was later identified as a Norteno gang member, which would support a finding that a notation of Norteno gang membership would have been placed on the card after the incident in question. Also, in the notations for April 26, 2001, where the gang issue is addressed upon Mooring's arrest and entry into the system, the field arrest card notes state that Mooring was then identifying himself as without a gang even though he once identified as Hunter's Point 415 gang member.[3] Additionally, Mooring has not shown that Gonzalez would have understood the "N" on the field arrest card to mean that Mooring was in any gang, let alone the Norteno gang.

Mooring's case fails for lack of proof: there is no evidence that Gonzalez knew Mooring was in the Norteno gang and there is no evidence that he could have learned that fact by looking at Mooring's housing record. In his declaration, Gonzalez acknowledges that housing Nortenos and Sorenos together would create a risk of harm. But knowing that the two gangs did not get along does not mean he was deliberately indifferent when he put Mooring in with the Sorenos in light of the absence of evidence that he knew Mooring was a Norteno.

Mooring has not created a triable issue of fact by saying that he told Gonzalez that he had "gang affiliation" concerns. At most, he gave an ambiguous answer and failed to elaborate on the specific concerns prompting his objection to being housed in cell E. He did not say something to the effect of "I don't want to go in there because I'm a Norteno, they are Sorenos and they'll attack me" that would have alerted Gonzalez to the specific problem. Instead, he gave a vague "gang affiliates" answer and invited Gonzalez to read his record and figure out what that affiliation was and what it meant in terms of his prospective housing situation. Even if Gonzalez had reviewed the field arrest card and seen the Hunter's Point 415 gang reference, he would not have been alerted to the specific problem, because it did not identify a gang affiliation that signaled a danger for Mooring.

Certain of defendant's legal arguments deserve comment. First, the court does not embrace defendant's very broad proposition that rival gang members can be housed together without constitutional concerns. Gang membership can be relevant to determining whether a plaintiff-inmate is exposed to an unacceptable risk of danger from other inmates by, for example, explaining the reason for animosity be-

---

**3.** There is no evidence that the Hunter's Point 415 gang was incompatible with the Sorenos. Had Gonzalez seen this notation on the field arrest card, he would not have been made aware of any danger to Mooring from the Sorenos as there is no indication that the Hunter's Point 415 gang and the Sorenos were a danger to each other.

tween inmates who don't know each other personally. The court agrees with defendant's more limited arguments that there is no constitutional right for every gang member to be kept separate from members of every other gang and that there must be a showing of a specific risk to the gang member plaintiff to establish the existence of a substantial risk of serious harm.

██ Second, the court rejects the suggestion that the vulnerability of the plaintiff is a necessary part of the deliberate indifference equation. Gonzalez distinguishes his case from *Farmer v. Brennan, supra,* and *Estate of Ford v. Ramirez–Palmer, infra,* by stating that those cases involved effeminate homosexuals victimized by other inmates. And Gonzalez emphasizes that Mooring was large and had worked security at a concert hall. The Fourteenth Amendment right for pre-trial detainees to due process (and the comparable Eighth Amendment right for convicts to be free from cruel and unusual punishment) does not depend on the inmate's sexual orientation. And every inmate, from the scrawniest to the brawniest, has the right to have his jailers not be deliberately indifferent to a substantial risk of serious harm to him. *Cf. Farmer v. Brennan,* 511 U.S. at 834, 114 S.Ct. 1970 ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.' ")

Although the court disagrees with Gonzalez' reading of the law to minimize his legal duties, the court agrees that Gonzalez has shown the absence of a triable issue of fact on Mooring's Fourteenth Amendment claim. To survive the summary judgment motion, Mooring had to show a triable issue of fact as to the objective and subjective prongs of deliberate indifference. He did not raise a triable issue of fact that Gonzalez was, subjectively, deliberately in-

different to a substantial risk to his safety. Even viewing the evidence and the inferences drawn therefrom in the light most favorable to Mooring, no reasonable jury could return a verdict for him and against Gonzalez. Gonzalez is entitled to judgment as a matter of law on the deliberate indifference claim.

### C. *Qualified Immunity*

The defense of qualified immunity protects "government officials ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The rule of qualified immunity " 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.' " *Burns v. Reed,* 500 U.S. 478, 495, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991) (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201, 121 S.Ct. 2151. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.... 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' ...

The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201–02, 121 S.Ct. 2151 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

 The first step under *Saucier* is to determine whether a constitutional violation was alleged. The court previously determined that the allegations of the complaint stated a claim for relief against Gonzalez for a Fourteenth Amendment violation. As a matter of *pleading,* plaintiff's complaint sufficed to allege a Fourteenth Amendment claim even if it would not suffice to *prove* such an injury. Additionally, as shown in the section above, the evidence in the record does not establish a Fourteenth Amendment violation. Even if the evidence did establish such a violation, that would only address the first step of the *Saucier* analysis.

The next step under *Saucier* is to consider whether the contours of the right were clearly established, an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. The law was clearly established that a correctional officer could not disregard a substantial risk of serious harm to an inmate of which he was aware and had a duty to protect an inmate from violence at the hands of other inmates. *See Farmer v. Brennan,* 511 U.S. at 833, 114 S.Ct. 1970. But there was no clearly established right for an inmate to choose his cellmates. Before the decision to place Mooring in cell E, "it would have been clear to a reasonable prison official that if he knew about an excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he would violate the law by disregarding it." *Estate of Ford v.*

*Ramirez–Palmer,* 301 F.3d 1043, 1050 (9th Cir.2002).

The Ninth Circuit clarified the qualified immunity analysis for a deliberate indifference claim in *Estate of Ford.* The court explained that, for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must *subjectively* have a sufficiently culpable state of mind, i.e., " 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences.' … Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity. *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151." *Estate of Ford,* 301 F.3d at 1050 (quoting *Farmer v. Brennan,* 511 U.S. at 834, 114 S.Ct. 1970). In *Estate of Ford,* the court explained that even though the general rule of deliberate indifference had been expressed in *Farmer,* no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.' " *Estate of Ford,* 301 F.3d at 1051 (quoting *Farmer,* 511 U.S. at 834 n. 3, 114 S.Ct. 1970). Because it hadn't been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm. *Farmer* left that an open issue. This necessarily informs 'the dispositive question' of whether it would be

clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Estate of Ford*, 301 F.3d at 1051 (emphasis in original).

Applying *Estate of Ford* here, it would not have been clear to a reasonable prison official when the risk of harm from housing an inmate in a cell containing Soreno gang members when the inmate said he had "gang affiliation" concerns but did not identify himself as a Norteno gang member specifically and was not known to the official to be from the Norteno gang changed from being a risk of some (or even any) harm, to a substantial risk of serious harm from one of those inmates. A reasonable prison official understanding that he could not recklessly disregard a serious risk to inmate safety could know that Mooring said he had gang affiliation concerns and objected to the cell placement but reasonably perceive that Mooring's exposure to any harm was not that high when there was no evidence of a specific threat from the inmates in cell E to Mooring. Because the law did not put Gonzalez on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Saucier*, 533 U.S. at 202, 121 S.Ct. 2151. Gonzalez met his burden of proof in his moving papers. Mooring did not introduce *evidence* to show the existence of a genuine issue of fact on the defense. Gonzalez is entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED. (Docket # 15.) Judgment now will be entered in favor of defendant and against plaintiff. Defendant's motion to amend/correct, which merely amends the notice of motion, is GRANTED. (Docket # 23.)

The clerk shall close the file.

IT IS SO ORDERED.