**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARTY CORTEZ, a single woman, on her own behalf, and as Personal Representative of the Estate of Philip Anthony Cortez, *Plaintiff-Appellant* <br><br> v. <br><br> BILL SKOL; STATE OF ARIZONA, a body politic, *Defendants-Appellees*. | No. 12-16688 <br><br> D.C. No. 4:09-cv-00526-JGZ <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Jennifer G. Zipps, District Judge, Presiding

Argued and Submitted
November 19, 2014—San Francisco, California

Filed January 26, 2015

Before: Ronald M. Gould, Paul J. Watford,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Friedland

## SUMMARY[*]

### Prisoner Civil Rights

The panel reversed the district court's summary judgment in an action brought pursuant to 42 U.S.C. § 1983 and state law alleging that Arizona state prison officials failed to protect an inmate from an attack by two other inmates during a prison escort, and remanded.

The panel held that viewed in the light most favorable to plaintiff, there was sufficient evidence that the undermanned escort by one prison guard of three mutually hostile, half-restrained, high-security inmates through an isolated prison passage posed a substantial risk of harm. The panel further held that viewed in the light most favorable to plaintiff, there was sufficient evidence that the escorting officer was subjectively aware of the risk involved and acted with deliberate indifference to the inmate's safety. Because the panel concluded that there were disputed material facts with respect to deliberate indifference, and because Arizona's gross negligence standard was lower than the federal deliberate indifference standard, the panel concluded that there were also disputed material facts with respect to gross negligence.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

David L. Abney (argued), Knapp & Roberts, Scottsdale, Arizona; John P. Leader, The Leader Law Firm, Tucson, Arizona, for Plaintiff-Appellant.

Michael E. Gottfried (argued), Assistant Attorney General; Thomas C. Horne, Arizona Attorney General, Phoenix, Arizona, for Defendants-Appellees.

**OPINION**

FRIEDLAND, Circuit Judge:

Contrary to prison policy and the training he provided others, Corrections Officer Bill Skol escorted three mutually hostile, half-restrained, high-security inmates by himself through an isolated prison passage known as "no man's land." Two of the inmates attacked the third, Philip Cortez, and stomped on the back of his head for five minutes as he lay face down and handcuffed on the ground. The attack left Cortez with severe, permanent mental impairment. His mother brought suit on his behalf, alleging a § 1983 claim against Skol and a gross negligence claim against the State of Arizona. The district court granted summary judgment to Defendants. Because there is evidence that creates genuine factual disputes for trial, we reverse.

## I. Background

We begin with some foundational facts that are not in dispute.

In 2007, Bill Skol was a visitation officer assigned to the Morey Unit of Arizona's Lewis Prison Complex. In that role, he was responsible for escorting inmates between their housing units and the visitation building.

Of the approximately 850 inmates assigned to the Morey Unit, about 160 were housed in its detention unit, which was designed to segregate certain inmates from the broader population. The segregated inmates included those who had recently assaulted other inmates, as well as inmates who were at risk of being assaulted and had sought protective segregation. Everyone in the detention unit was classified as a "Level 5" inmate, the highest security designation in the Arizona prison system.

When detention unit inmates had visitors, a written prison policy instructed that they be restrained in belly chains[1] and leg irons while being moved to the visitation building. To prevent contact with general population inmates, officers led them to visitation through a back-alley area called "no man's land"—a dirt path with many pebbles, rocks, and crevices. Escorts in no man's land occurred outside the view of cameras and non-escorting officers.

On November 16, 2007, officers applied belly chains, but not leg irons, to detention unit inmates Philip Cortez, Juan Cruz, and Steven Lavender to prepare them for visitation. Skol and another officer, Roger Smith, picked up the inmates from the detention unit, escorted them to the visitation building, and placed them in the "back cage"—an enclosure that holds inmates who are not allowed physical contact with their visitors. The back cage is separated from

---

[1] Belly chains are handcuffs attached to a chain around the inmate's waist.

the visitation room by a wall with a glass partition, and inmates speak to their visitors through holes in the glass. During the inmates' visits, Skol stationed himself in the visitation room and Smith went to the administrative office.

When the visits were over, Skol set out to escort the three inmates back to the detention unit by himself. Partway through the ten-minute journey across no man's land, Skol reached for his keys to unlock a gate, and, in his peripheral vision, saw Lavender trying to block his view as Cruz kicked Cortez. Cortez fell to the ground as Lavender joined the attack. With Cortez lying face down, Cruz and Lavender kicked and stomped on the back of his head. Skol's incident report states that, after he verbally directed Cruz and Lavender to stop and get on the ground, the following events occurred:

> 10:30am:  Skol called for backup and a medical team.
>
> 10:31am:  Skol gave another verbal directive to stop and get on the ground, which Cruz and Lavender ignored. Skol repeated the command in a louder voice and threatened to deploy chemical agents. Again, Cruz and Lavender ignored him.
>
> 10:32am:  Skol deployed a one-second burst of pepper spray to the faces of Cruz and Lavender. Both inmates were unaffected by the spray.

> 10:33am:    Skol deployed another one-second burst of spray. Unaffected, Cruz and Lavender continued stomping on Cortez.

> 10:34am:    Skol deployed a third one-second burst of spray. Backup officers arrived and the assault ended.

Cortez suffered a brain injury that caused severe, permanent mental impairment. He was granted clemency and released from prison on account of his injury, and he later died of an apparent drug overdose.

Cortez's mother, Marty Cortez, brought suit on her son's behalf, asserting a failure-to-protect claim against Skol pursuant to 42 U.S.C. § 1983 and a gross negligence claim against the State of Arizona.[2] Defendants filed a motion for summary judgment, which was first heard by a magistrate. The magistrate concluded that sufficient evidence supported the claims against Skol and the State of Arizona, including some that implicated material factual disputes, and recommended denying the motion. The district court disagreed and granted summary judgment in favor of Defendants. This timely appeal followed.

---

[2] Plaintiff's complaint also includes a separately numbered § 1983 count for punitive damages, but because punitive damages are a remedy rather than an independent cause of action, we refer to Plaintiff's § 1983 claim in the singular.

## II. Standard of Review

We review a grant of summary judgment de novo. *Furnace v. Sullivan*, 705 F.3d 1021, 1026 (9th Cir. 2013). "Summary judgment is appropriate only if, taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Id.* (internal quotation marks omitted). "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (internal quotation marks omitted).

## III. § 1983 Claim

The Eighth Amendment imposes a duty on prison officials to protect inmates from violence at the hands of other inmates. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). A prison official violates this duty when two requirements are met. *Id.* at 834. First, objectively viewed, the prison official's act or omission must cause "a substantial risk of serious harm." *Id.* Second, the official must be subjectively aware of that risk and act with "deliberate indifference to inmate health or safety." *Id.* at 834, 839–40 (internal quotation marks omitted). In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Deliberate indifference is "something more than mere negligence" but "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. A prison official's deliberate indifference may be established

through an "inference from circumstantial evidence" or "from the very fact that the risk was obvious." *Id.* at 842.

### 1.  Serious Risk

Viewed in the light most favorable to Plaintiff, there is sufficient evidence that Skol's escort posed a substantial risk of serious harm.[3]

It is undisputed that the detention unit housed a volatile mix of prisoners—including inmates who had committed assaults and inmates who were targets for possible assault. An investigator for the Arizona Department of Corrections testified after the incident about why an officer would not want to escort three detention unit inmates by himself: "It's

---

[3] Defendants assert that they objected below to various pieces of evidence. With one exception (regarding Officer Smith's alleged hearsay statement to a state investigator, which we discuss below), Defendants waived these objections by failing to request a ruling on them in the district court. *See Fenton v. Freedman*, 748 F.2d 1358, 1360 (9th Cir. 1984) ("The failure of a litigant to request a ruling is a waiver of the right to raise any issue before this Court concerning admissibility."). Defendants also fail to explain the grounds for their objections in their brief to this court, which is a further basis for waiver. *See Am. Int'l Enters. v. FDIC*, 3 F.3d 1263, 1266 n.5 (9th Cir. 1993) ("Issues raised in the brief that are not supported by argument are deemed abandoned."). In a similar vein, Defendants contend that Plaintiff cannot establish any disputed facts because she failed to comply with a local rule governing the formatting of her statement of facts. The district court rejected this argument, and we defer to that conclusion. *See Qualls ex rel. Qualls v. Blue Cross of Cal., Inc.*, 22 F.3d 839, 842 n.2 (9th Cir. 1994) ("District courts have broad discretion to interpret their local rules. Only in rare cases will we question the exercise of discretion in connection with the application of the local rules." (citation and internal quotation marks omitted)). Defendants also object to Plaintiff's expert report, but we need not resolve that objection because we do not rely on the expert report for any purpose.

common sense. Detention inmates are inmates that don't go along with either the programs in regular prison or there's other issues, whether they're in protective custody or they're gang members or what . . . they could have just assaulted somebody. I certainly will not transport three inmates by myself."

Testimony by Skol's colleagues similarly indicated that one-on-three escorts were dangerous, particularly in no man's land. Officer Smith stated in his declaration that, according to the training he received directly from Skol, having one officer escort three inmates was not recommended.[4] Another officer testified that, although escorts in other areas can be viewed by staff or cameras, no man's land is out of view. That officer further explained that he would not escort three inmates alone in no man's land because he would be outnumbered and it would create a safety issue.

In addition to the general risks of undermanned escorts of detention unit inmates through no man's land, the record contains evidence of dangers specific to Cruz, Lavender, and Cortez. Skol told Officer Smith after the incident that "there was a lot [of] talk and harassing words between the three inmates in the back cage." Cruz also told an investigator that he had attacked Cortez for calling him and Lavender "clowns" and for "running his mouth" about being a protective custody inmate who did not have to answer to anyone. One of Skol's colleagues, Sergeant Brian Hawthorne, testified that Cortez was a protective custody inmate and that it was common knowledge among

---

[4] Skol stated in his declaration that he had previously escorted three inmates by himself without problems. This is something for the jury to consider at trial.

prison guards that such inmates are targeted for attack by other prisoners. According to Hawthorne, it was a "rule within the prison" that protective custody inmates had a "green light," meaning "any race, at any time, [other inmates are] supposed to attack them and take them out." Cortez's status as a protective custody inmate is in dispute, but between Sergeant Hawthorne's testimony and Cortez's own statement to his attackers that he was a protective custody inmate, a reasonable jury could find that Cortez was at least *perceived* among guards and prisoners as being in protective custody. This perception of Cortez's protective custody status, combined with the animosity between the inmates arising out of the harassing talk, would have heightened the risk of Skol's escort.[5]

It is also relevant that the inmates were without leg restraints. The deputy warden of the Morey Unit testified at his deposition that, at the time of the attack, a written prison policy required both upper and lower restraints and that the inmates involved in the incident "should have been in both upper and lower restraints." The prison's chief of security at the time of the incident said the same. Skol and other officers dispute this, saying that, by the time of the attack, the prison had been safely operating under a newer directive that instructed against using leg restraints, issued after an inmate had tripped and injured himself in no man's land. But the record provides reason to doubt that such a directive ever issued. The deputy warden testified that he tried to locate something about the supposed change, including the grievance by the injured inmate that purportedly motivated it, but was unable to find anything.

---

[5] Defendants point to an inmate database record to show that Cortez was not a protective custody inmate. However, a perception of Cortez's protective custody status is relevant to the risk of the transport, even if not reflected in the prison's formal records.

Even if Defendants could produce such evidence, however, the fact that there was a written policy requiring leg irons supports the notion that there were risks to moving inmates without them.

Finally, Skol's unwillingness to physically intervene once the attack began could demonstrate that he took a substantial risk. A jury could reasonably conclude that, by putting himself in a situation in which he was outnumbered, out of view, and away from backup—and thus uncomfortable intervening when two inmates attacked a third—Skol exposed Cortez to a substantial risk of serious injury.

## 2. *Deliberate Indifference*

Viewed in the light most favorable to Plaintiff, there is sufficient evidence that Skol was subjectively aware of the risk involved in the escort and acted with deliberate indifference to Cortez's safety. Skol insists that he knew nothing about several of the dangerous aspects of the escort, but there is sufficient evidence for a jury to disbelieve him.

First, there is evidence suggesting that Skol knew about the hostility between the inmates. In his interview with the state investigator, Officer Smith said that Skol told him that "there was a lot [of] talk and harassing words between the three inmates in the back cage."[6] Although Smith's later declaration—prepared in the course of this litigation—describes his prior statement as "ambiguous" and says that

---

[6] Defendants contend that Smith's repetition of Skol's statement to the investigator is hearsay, but Plaintiff does not need to rely on the investigator's account because Smith acknowledged the truth of the statement in his later declaration.

it should not be interpreted to mean that Skol heard the harassing talk in real time, a reasonable jury could think otherwise. Smith does not supply a basis for his assertion that Skol learned about the harassing talk only after the attack, and it is seemingly at odds with the manner in which Skol responded when the investigator asked whether he was aware of the harassing talk. If Smith's interpretation were correct, one might expect Skol to have answered by saying that he knew about the harassing talk but had learned about it only after the fact. Instead, Skol told the investigator that *if* there was harassing talk, he did not hear it.

Second, a reasonable jury could conclude that Skol was aware of Cortez's protective custody status. Sergeant Hawthorne testified that he knew Cortez was a protective custody inmate and that "[w]hoever worked detention unit" would have known the same. Defendants assert that Hawthorne's statement does not pertain to visitation officers like Skol, but they fail to offer evidence that officers who regularly escort detention unit inmates cannot be said to "work" the detention unit. Although Defendants' interpretation is certainly a plausible one and could be argued to a jury, it is not compelled by the record, and we are required to view the evidence in the light most favorable to Plaintiff. Upon doing so, we conclude that a reasonable jury could find that Skol knew Cortez was a protective custody inmate and was therefore aware of a heightened risk that Cruz and Lavender would attack him during the escort.

Third, there is evidence that Skol knew that prison policy required leg restraints when moving detention unit inmates. Skol testified at his deposition that he was aware of the written policy, but stressed his understanding that it applied only to the detention unit, not to visitation, and

required leg irons only when inmates were being transported by vehicle. Skol's testimony is at odds with that of the Morey Unit's deputy warden and the prison's chief of security, both of whom testified that the prison's written policy required upper and lower restraints for visitation escorts. Skol's admitted awareness of the policy, combined with the prison administrators' testimony regarding its effect, raises a genuine issue as to whether Skol proceeded with the escort despite knowing that the inmates were not properly restrained.

Finally, a jury might reasonably question Skol's credibility generally. According to Skol's incident report, written on the day of the attack, Cruz and Lavender "instantly dropped to the ground and followed directives" when backup arrived. Skol reiterated that account at his deposition and testified that backup officers did not "put any hands" on Cruz or Lavender. But one of the backup officers tells a different story. Sergeant Hawthorne testified that Cruz and Lavender did not instantly drop to the ground or comply with orders. Rather, Hawthorne said he had to physically subdue them, first by forcing Cruz down, and then, as another officer held Cruz down, by wrestling Lavender to the ground and staying on top of him until more officers arrived. Similarly, there are inconsistencies with respect to why Skol embarked on the escort alone. Skol told the state investigator that he escorted the inmates by himself because he and Officer Smith were "trying to 'hastily' get things done because visitation was very busy that day." Skol's later declaration—written in the midst of this litigation—offered a slightly different motivation for moving the inmates alone. Instead of saying that visitation was busy, Skol stated that he was concerned that the inmates would miss an impending prisoner count in the detention unit and that

failing to have inmates in their housing units during a count "creates the possibility of a security issue." Skol further stated that because Smith had a lot of paperwork to do, the two of them "agreed" that Skol would do the escort alone. Smith's declaration, in contrast, does not mention paperwork or a prisoner count, and it does not portray Skol's solo escort as a joint decision. Rather, it says that Skol "chose" to escort the inmates by himself because "he was in a rush to get them back to the [detention unit] to bring more inmates back to visitation." A jury might reasonably conclude from these inconsistencies that Skol is untrustworthy, and therefore disbelieve his professed ignorance of the harassing talk, Cortez's protective status, and the effect of the leg iron policy.

*        *        *

In sum, there are triable issues of material fact related to Skol's awareness of an objectively substantial risk of serious harm.[7]

---

[7] The district court did not decide whether Skol is entitled to qualified immunity, and we decline to reach that issue in the first instance. *See Am. President Lines, Ltd. v. Int'l Longshore & Warehouse Union, Ak. Longshore Div., Unit 60*, 721 F.3d 1147, 1157 (9th Cir. 2013) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." (internal quotation marks omitted)); *Richardson v. Runnels*, 594 F.3d 666, 672 (9th Cir. 2010) ("[W]e do not reach qualified immunity because the issue has never been addressed by the district court.").

## IV. Gross Negligence Claim

We likewise conclude that genuine fact disputes preclude summary judgment with respect to gross negligence.[8]

Under Arizona law, "[a] party is grossly or wantonly negligent if he acts or fails to act when he knows or has reason to know facts which would lead a reasonable person to realize that his conduct not only creates an unreasonable risk of bodily harm to others but also involves a high probability that substantial harm will result." *Walls v. Ariz. Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991). This standard is less exacting than the federal deliberate indifference standard. *See Braillard v. Maricopa Cnty.*, 232 P.3d 1263, 1273 (Ariz. Ct. App. 2010) (relying on the Eleventh Circuit's statement that "[a] claim of deliberate indifference requires proof of more than gross negligence" (quoting *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)) (internal quotation marks omitted)).[9] The State is liable for the actions of its

---

[8] Both parties refer to state procedural law on summary judgment in connection with the gross negligence claim, but the standard for summary judgment set forth in Rule 56(a) of the Federal Rules of Civil Procedure controls. The district court had federal question jurisdiction over the § 1983 claim and supplemental jurisdiction over the state-law gross negligence claim, and "a federal court exercising supplemental jurisdiction over state law claims is bound to apply the law of the forum state to the same extent as if it were exercising its diversity jurisdiction." *Bass v. First Pac. Networks, Inc.*, 219 F.3d 1052, 1055 n.2 (9th Cir. 2000). Under the *Erie* doctrine, "federal courts sitting in diversity must apply the Federal Rules of Civil Procedure." *Knievel v. ESPN*, 393 F.3d 1068, 1073 (9th Cir. 2005).

[9] The Arizona Court of Appeals has also cited the Second Circuit's observation that deliberate indifference is "closely intertwined" with gross negligence. *Rourk v. State*, 821 P.2d 273, 280 (Ariz. Ct. App.

employees in the scope of their employment. *See Rourk v. State*, 821 P.2d 273, 275–76, 280 (Ariz. Ct. App. 1991).

Because we have concluded that there are material fact disputes with respect to deliberate indifference, and because Arizona's gross negligence standard is lower than the federal deliberate indifference standard, we necessarily conclude that there are also material fact disputes with respect to gross negligence. Indeed, in addition to being responsible for Skol's behavior, the State may also be liable for the aggregate conduct of other prison staff. *See, e.g.*, *Armenta v. City of Casa Grande*, 71 P.3d 359, 365 (Ariz. Ct. App. 2003) (discussing whether "the City knew or should have known" certain facts and whether "the City's actions would have led it to realize" a risk); *Rourk*, 821 P.2d at 275–76, 280 (describing actions of a state agency that seem to have been taken by multiple employees and describing what the agency knew or should have known based on the aggregate actions of those employees). This means that the State also could be responsible for the actions of the officers who failed to place leg irons on the inmates on the day of the attack and for any informal directive to stop applying leg restraints for escorts through no man's land. Summary judgment on Plaintiff's gross negligence claim was thus improper.

---

1991) (citing *Doe v. N.Y.C. Dep't of Soc. Servs.*, 649 F.2d 134, 143 (2d Cir. 1981)). *Rourk* is consistent with *Braillard* because gross negligence can be both closely intertwined with deliberate indifference and also a lower standard. *Braillard*'s statement that gross negligence requires less proof than deliberate indifference makes sense because gross negligence merely requires "reason to know" facts that would lead to recognition of a risk, whereas deliberate indifference demands actual, subjective awareness.

## V. Conclusion

For the reasons discussed above, we **REVERSE** the district court's grant of summary judgment on Plaintiff's § 1983 and gross negligence claims and **REMAND** for further proceedings.[10]

---

[10] Plaintiff has asked for attorney's fees under 42 U.S.C. § 1988(b). We deny this request, without prejudice to renewal, because Plaintiff is not, at this point, a prevailing party. *See Hervey v. Estes*, 65 F.3d 784, 792 (9th Cir. 1995) ("Section 1988 does not provide for attorney fees when a party merely establishes a right to trial.").