Opinion by Judge GILMAN; Concurrence by Judge CALLAHAN; Partial Concurrence and Partial Dissent by Judge GRABER.
OPINION
GILMAN, Senior Circuit Judge:
In October 2009, Jonathan Castro was arrested for being drunk in public. He was housed in a “sobering cell” at the Los Angeles Sheriffs West Hollywood Station where, a few hours after his arrest, he was savagely attacked by another intoxicated arrestee who had been placed in the cell with him. The officer on duty at the jail failed to respond to Castro’s pounding on the cell door despite evidence that the officer was well within range to hear the pounding. Castro suffered serious harm, including a broken jaw and traumatic brain injury.
This lawsuit was filed by Castro in the United States District Court for the Central District of California in July 2010. He brought both federal- and state-law claims against the County of Los Angeles, the Los Angeles County Sheriffs Department, and a number of John Doe defendants who were later identified as two of his jailers. After a six-day trial, the jury returned a verdict for Castro against both the individual and entity defendants, awarding him over $2.6 million in past and future damages.
The defendants then renewed their joint motion for judgment as a matter of law, arguing that there was insufficient evidence to support the verdict, that the individual defendants were entitled to qualified immunity, and that Castro’s theory of liability against the County and the Sheriffs Department (these two entities being hereinafter collectively referred to as the County) was simply untenable. The district court denied the defendants’ motion without a written opinion. They now appeal. For the reasons set forth below, we AFFIRM the judgment of the district court against the individual defendants but REVERSE the judgment against the County.
I. BACKGROUND
A. Assault on Castro
Castro was arrested late in the evening of October 2, 2009 for public drunkenness. The arresting officers reported that Castro was staggering, bumping into pedestrians, and speaking unintelligibly, so they arrested him “for his safety.” He was transported to the West Hollywood Station and placed in a fully walled sobering cell that was stripped of objects with hard edges on which an inmate could hurt himself if he lost his balance. The cell contained only a toilet and a series of mattress pads on the floor. A short time later, Jonathan Gonzalez was arrested after punching out a window at a nightclub. "The officers brought Gonzalez to the West Hollywood Station, where he was placed in the same sobering cell that housed Castro. Gonzalez’s intake forms indicated that he was “combative” at the time he was placed'in the cell.
*343 Shortly after Gonzalez was placed in the cell, Castro approached the door and pounded on the window in the door for a full minute, attempting to attract an officer’s attention. No one responded. A community volunteer at the jail, Gene Schiff, came by approximately 20 minutes later. He noted that Castro appeared to be asleep and that Gonzalez was “inappropriately” touching Castro’s thigh, the latter circumstance being in violation of jail policy. Schiff did not enter the cell to investigate. Instead, he reported the contact to the supervising officer, Christopher Solomon. Solomon took no action until he heard loud sounds six minutes later. He rushed to the sobering cell and saw Gonzalez making a violent stomping motion. Solomon immediately opened the door and discovered that Gonzalez was stomping on Castro’s head. Solomon ordered Gonzalez to step away from Castro. Seeing that Castro was by then lying unconscious in a pool of blood, Solomon called for medical assistance.
When the paramedics arrived, Castro was still unconscious, in respiratory distress, and turning blue. He was hospitalized for almost a month, then transferred to a long-term care facility, where, he remained for four years. He currently suffers from severe memory loss and permanent cognitive impairments. Even after his release from the long-term care facility, Castro remains incapable of performing simple life functions, such as cooking and maintaining hygiene. His family is responsible for his basic care to this day.
B. District court proceedings
After his complaint was filed, Castro substituted Solomon and Solomon’s supervisor, Sergeant David Valentine, for the John Doe defendants named in the original complaint. Solomon was the jail’s officer on duty on the evening in question and Valentine was the watch sergeant in charge of the jail as a whole. Castro’s basic theory of liability under 42 U.S.C. § 1983 was that both the County and the individual defendants were deliberately indifferent to the substantial risk of harm created by housing him in the same sobering cell as Gonzalez and by failing to maintain appropriate supervision of the cell. The complaint also set forth a variety of state-law claims, not one of which is raised by any party to this appeal.
The individual defendants moved to dismiss the claims against them on the ground of qualified immunity, but the district court rejected their arguments. It concluded that a jury could find that placing an actively belligerent inmate in an unmonitored cell with Castro constituted deliberate indifference to a substantial risk of harm, in violation of Castro’s constitutional rights.
The case proceeded to trial. After Castro rested his case, the defendants moved for judgment as a matter of law on three grounds: (1) insufficient evidence that the design of a jail cell constitutes a policy, practice, or custom by the County that resulted in a constitutional violation; (2) insufficient evidence that a reasonable officer would have known that housing Castro and Gonzalez together was a violation of Castro’s constitutional rights; and (3) insufficient evidence for the jury to award punitive damages. The district court denied the motion in its entirety. Five days later, the jury returned a verdict for Castro on all counts and awarded him $2,605,632.02 in' damages. Based on the jury’s findings, the parties later stipulated to $840,000 in attorney fees, $12,000 in punitive damages against Valentine, and $6,000 in punitive damages against Solomon.
After trial, the defendants timely filed a renewed motion for judgment as a matter *344 of law. The trial court denied the renewed motion without issuing a written opinion. This timely appeal followed.
II. ANALYSIS
A. Standard of review
We review de novo the district court’s denial of a motion for judgment as a matter of law. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 998, 1005 (9th Cir.2004). A renewed motion for judgment as a matter of law is properly granted only “if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury’s verdict.” Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir.2002). “A jury’s verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury’s conclusion, even if it is also possible to draw a contrary conclusion.” Id.
In making this determination, the court must not weigh the evidence, but should simply ask whether the plaintiff has presented sufficient evidence to support the jury’s conclusion. Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227-28 (9th Cir.2001). Although the court must review the entire evidentiary record, it must view all the evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in the favor of the nonmover, and disregard all evidence favorable to the moving party that the jury is not required to believe. Id. at 1227.
The defendants raise a number of issues on appeal, ranging from discrete legal questions to disputed matters of evidence. We first address the arguments raised by the individual defendants, then move on to those presented by the County.
B. Neither Solomon nor Valentine is entitled to qualified immunity
Both individual defendants — Solomon and Valentine — argue that the judgment against them should be reversed because they are entitled to qualified immunity. The doctrine of qualified immunity shields government officials from civil liability under 42 U.S.C. § 1983 if “their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). “Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.” Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).
To determine whether an officer is entitled to qualified immunity, a court must evaluate two independent prongs: (1) whether the officer’s conduct violated a constitutional right, and (2) whether that right was clearly established at the time of the incident. Id. at 232, 129 S.Ct. 808. These prongs may be addressed in either order. Id. at 236,129 S.Ct. 808.
The constitutional right at issue in this case is the right to be free from violence at the hands of other inmates. This right was first recognized by the Supreme Court in Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In Farmer, a male-to-female transgender person was placed in male housing in the federal prison system, where she was beaten and raped by another inmate. Id. at 830, 114 S.Ct. 1970. She brought a civil rights action for damages and an injunction, alleging that the corrections officers had acted with deliberate indifference to *345 her safety, in violation of the Eighth Amendment. Id. at 830-31, 114 S.Ct. 1970. The Supreme Court agreed with her, holding that “prison officials have a duty ... to protect prisoners from violence at the hands of other prisoners” because corrections officers have “stripped [the inmates] of virtually every means of self-protection and foreclosed their access to outside aid.” Id. at 833, 114 S.Ct. 1970 (internal quotation marks omitted). This court has since clarified that the right to be free from violence at the hands of other inmates extends to inmates housed in state or local custody. See Cortez v. Skol, 776 F.3d 1046, 1049-50 (9th Cir.2015) (recognizing a claim based on Farmer brought by a state prisoner).
Both Solomon and Valentine acknowledge that the duty to protect Castro from violence was clearly established at the time of the incident. But they argue that such a broad definition of that duty is too general to guide this court’s analysis. Moreover, they contend that Castro failed to present substantial evidence to establish that they violated their duty to protect him.
“To determine that the law was clearly established, we need not look to a case with identical or even ‘materially similar’ facts.” Serrano v. Francis, 345 F.3d 1071, 1077 (9th Cir.2003) (quoting Hope v. Pelzer, 536 U.S. 730, 739-41, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). The question instead is whether the contours of the right were sufficiently clear that a reasonable official would understand that his actions violated that right. Id.; see also Saucier v. Katz, 533 U.S. 194, 202, 121 S.Ct. 2151,150 L.Ed.2d 272 (2001).
Following the Supreme Court’s 1994 decision in Farmer, this court has considered over 15 different failure-to-protect claims stemming from inmate-on-inmate violence. In each case, the court has recited the standard established by Farmer, then proceeded to apply that standard to the facts of the case before the court. The similarity of the facts — or the lack thereof — to other post-Famer cases has rarely entered the discussion. See, e.g., Robinson v. Prunty, 249 F.3d 862, 866-67 (9th Cir.2001).
Instead, the right at issue is construed simply as the right to be protected from • attacks by other inmates. This is in stark contrast with the qualified-immunity analysis for other types of claims, such as excessive force, in which analogies to prior cases play a much stronger role. See Maxwell v. Cnty. of San Diego, 708 F.3d 1075, 1082-83 (9th Cir.2013); Winterrowd v. Nelson, 480 F.3d 1181, 1185-86 (9th Cir. 2007); Drummond ex rel. Drummond v. City of Anaheim, 343 F.3d 1052, 1056-61 (9th Cir.2003). In sum, Farmer sets forth the contours of the right to be free from violence at the hands of other inmates with sufficient clarity to guide a reasonable officer. Solomon and Valentine’s argument on this point is- therefore without merit.
They next question the sufficiency of the evidence supporting Castro’s claim of deliberate indifference. Because Castro was a pretrial detainee, his right to be free from violence at the hands of other inmates arises from the Fourth Amendment rather than the Eighth Amendment. Pierce v. Multnomah County, 76 F.3d 1032, 1042-43 (9th Cir.1996). Despite those different constitutional sources, the “deliberate indifference” test is the same for pretrial detainees and for convicted prisoners. Clouthier v. County of Contra Costa, 591 F.3d 1232, 1242-43 (9th Cir. 2010). Thus, in order to prove that his right to be free from violence at the hands of another inmate was violated, Castro was required to show by a preponderance of the evidence that (1) he faced a substantial *346 risk of serious harm, (2) the defendants were deliberately indifferent to that risk, and (3) the defendants’ failure to act was a proximate cause of the harm that he suffered. See Farmer, 511 U.S. at 847, 114 S.Ct. 1970. A defendant is deemed “deliberately indifferent” to a substantial risk of serious harm when he knew of the risk but disregarded it by failing to take reasonable measures to address the danger. Id. On the verdict form, the jury specifically found that both Solomon and Valentine were deliberately indifferent to Castro’s plight.
Castro noted several different ways in which Solomon and Valentine were deliberately indifferent to his risk of harm: both decided to house him in a fully walled sobering cell with a “combative” inmate; Solomon failed to respond to Castro’s banging on the window in the door of the cell; Solomon failed to respond fast enough to Gonzalez’s inappropriate touching; and Solomon erred in delegating the safety checks to a volunteer. We conclude that the jury could have found Solomon and Valentine liable based on the substantial evidence presented in support of one or more of these theories.

1. The jury could have found that Solomon was deliberately indifferent to a substantial risk of harm to Castro because he disregarded Castro’s pounding on the cell door

Castro’s most persuasive theory of deliberate indifference with respect to Solomon stems from Solomon’s failure to respond when Castro pounded on the door after Gonzalez was placed in the cell. Video footage presented at trial established that Castro pounded on the door for a full minute after Gonzalez entered the cell. Solomon was near the cell at the time, but testified that he did not hear the pounding. Solomon also contends that the video footage of the event shows that he “did not appear to hear any banging on the door by plaintiff.” Three other witnesses, however, including two jail employees, testified that one could hear simple talking from inside the sobering cell, such that pounding would have been easy to hear from where Solomon was standing.
Faced with this evidence, the jury could have reasonably concluded that Solomon heard the pounding and elected not to respond. “[A] jury may properly refuse to credit even uncontradicted testimony.” Guy v. City of San Diego, 608 F.3d 582, 588 (9th Cir.2010) (citing Quock Ting v. United States, 140 U.S. 417, 420-21, 11 S.Ct. 733, 35 L.Ed. 501 (1891)). Here, the jury was presented with circumstantial evidence that undermined Solomon’s assertion that he did not hear the pounding.
But Solomon contends in his brief that we are free to “disregard inferences in favor of the prevailing party where they are belied by a video account in the record,” citing Scott v. Harris, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). In this case, however, the video footage neither confirms nor refutes Solomon’s account. The jury had the opportunity to review both the footage and the testimony in context, and to perform a full assessment of each witness’s credibility. Given the testimony of three other witnesses, the jury had sufficient evidence to conclude that Solomon heard but ignored Castro’s attempts to attract attention. On appeal, we “may not substitute [our] view of the evidence for that of the jury.” Johnson v. Paradise Valley Unified Sch. Dist., 251 F.3d 1222, 1227 (9th Cir.2001).
We thus reach the question of whether Solomon’s failure to respond to Castro’s banging constituted deliberate indifference. The jury determined that it did. This court has long held that whether *347 or not a prison official’s actions constitute deliberate indifference is a subjective inquiry and a question of fact. Grenning v. Miller-Stout, 739 F.3d 1235, 1239 (9th Cir. 2014) (citing Johnson v. Lewis, 217 F.3d 726, 734 (9th Cir.2000)). Because questions of fact are uniquely the province of the jury, see Santos v. Gates, 287 F.3d 846, 852 (9th Cir.2002), its determination must stand when supported by substantial evidence, see Pavao v. Pagay, 307 F.3d 915, 918 (9th Cir.2002).
This leads to the issue of whether Solomon’s deliberate indifference was both an actual and a proximate cause of Castro’s harm. See Lemire v. Cal. Dep’t of Corr. & Rehab., 726 F.3d 1062, 1074 (9th Cir.2013) (holding that “plaintiffs alleging deliberate indifference must also demonstrate that the defendants’ actions were both an actual and proximate cause of their injuries”). Actual causation is “purely a question of fact,” Robinson v. York, 566 F.3d 817, 825 (9th Cir.2009), and the jury determined that Solomon’s deliberate indifference was in fact one of the causes of Castro’s harm.
But Solomon argues that this finding is unsupported by the evidence because Castro did not appear to be injured during a safety check performed 22 minutes after the pounding stopped. His proposed -restriction on the relevant timeline for causation, however, does not comport with this court’s prior rulings. See, e.g., Conn v. City of Reno, 591 F.3d 1081, 1098-1101 (9th Cir.2010) (holding that a corrections officer’s failure to respond to warnings of harm could be an actual cause of that inmate’s suicide 48 hours later), vacated, — U.S. -, 131 S.Ct. 1812, 179 L.Ed.2d 769 (2011), reinstated in relevant part, 658 F.3d 897 (9th Cir.2011). Because Solomon has presented no compelling reason to adopt his proposed arbitrary time limitation, we decline to do so. The jury’s verdict on actual causation is supported by sufficient evidence to remain undisturbed.
“‘Once it is established that the defendant’s conduct has in fact been one of the causes of the plaintiffs injury, there remains the question whether the defendant should be legally responsible for the injury.’ ” Id. at 1100 (quoting White v. Roper, 901 F.2d 1501, 1506 (9th Cir.1990)). A corrections officer will be held legally responsible for an inmate’s injuries if the officer’s actions are a “moving force” behind a series of events that ultimately lead to a foreseeable harm, even if other intervening causes contributed to the harm. Id. at 1101. If reasonable persons could differ over the question of foreseeability, that issue should be left to the jury. Id.
This court’s prior cases are instructive. In Conn, for example, this court found that a corrections officer’s failure to respond to an inmate’s attempt to choke herself and to her subsequent threats of suicide could be considered a proximate cause of her suicide two days after the threats, even though she was subjected to several medical examinations between the time of the threats and the time of her death. Id. at 1101-02. The question of foreseeability was left to. the jury. Id. Similarly, the court in White concluded that a corrections officer’s decision to forcibly place an inmate (the plaintiff) into a cell with another, violent inmate could be considered a “moving force” behind the injury that the plaintiff suffered when he attempted to run, such that the question should have been sent to a jury. White, 901 F.2d. at 1506. Here, the jury found that Solomon’s deliberate indifference was one of the causes of Castro’s harm. Leaving that decision to the jury is in concert with this court’s prior opinions.
Farmer clearly established that a corrections officer has a duty to act to protect *348 one inmate from violence at the hands of another. The jury was presented with sufficient evidence to find that Solomon was aware of but disregarded Castro’s attempts to alert Solomon to the danger faced by Castro. And the jury determined that Solomon’s deliberate indifference was both an actual and a proximate cause of Castro’s harm. Even if we might have reached a different conclusion when considering the totality of the circumstances, there is sufficient evidence to support the jury’s verdict on this issue.

2. The jury could have found that Valentine was deliberately indifferent to a substantial risk of harm to Castro when he placed Gonzalez in Castro’s cell

We next turn to Sergeant Valentine. The parties agree that Valentine may be held liable only for his own actions. Vicarious liability does not apply to claims brought under § 1983, so Valentine may not be held independently responsible for the actions of his subordinates. See Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Valentine was not in the immediate vicinity of the sobering cell for most of the events at issue in this case. The only relevant event for which he was present was the initial decision to house Gonzalez in the sobering cell with Castro, so we will focus our analysis on that decision.
Valentine argues that he is entitled to qualified immunity because a reasonable officer at the time of the incident would not have known that housing Gonzalez in the same cell as Castro would violate Castro’s constitutional rights. He relies heavily on Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043 (9th Cir.2002), to support this argument. In Ford, a group of prison officials decided to house the plaintiff with another inmate who had been classified as a “predator” after several past incidents of assault on his cellmates. Id. at 1046-47. Two days later, the “predator” inmate attacked and killed the plaintiff. Id. at 1047.
The predatory inmate in Ford, however, “had been successfully double-celled for years with other inmates” and had not been recommended for “single-celling” by the prison staff. Id. at 1051. Moreover, the plaintiff and the predator in Ford consented to be housed together. Id. at 1047. They had previously been housed together without incident, and there was no history of violence between them. Id. Based on that history, this court found that “it would not be clear to a reasonable prison official when the risk of harm from double-celling ... changes from being a risk of some harm to a substantial risk of serious harm.” Id. at 1051. (emphases in original). The court therefore held that the official was entitled to qualified immunity. Id. at 1053.
Ford’s central holding is that an officer is entitled to qualified immunity when the transition from a risk of some harm to a substantial risk of serious harm would not have been clear to a reasonable prison official. “[T]he qualitative difference between the degree of risk that will result in liability under the Eighth Améndment’s standard, and that which will not, is a fact-bound inquiry,” requiring deference to the trier of fact. A.D. v. Cal. Highway Patrol, 712 F.3d 446, 455 n. 4 (9th Cir. 2013). Here, a jury has already weighed in and found that Valentine was aware of and disregarded not merely a risk of some harm, but a substantial risk of serious harm to Castro.
Ford was not a case of two intoxicated strangers being thrown together in the middle of the night, but rather a calm, reasoned decision made with the input of all the affected parties. Faulting a prison *349 official for disregarding some risk of harm is difficult when the victim himself consented to the risk. Castro, on the other hand, did not consent to being housed with Gonzalez. Gonzalez and Castro had no history together, so Valentine had no basis to conclude that the risk of an altercation was minimal. Although Gonzalez had a. lesser history of violence in general than the predator inmate in Ford, Gonzalez’s combative nature when placed in the cell was in no way mitigated by any prior interaction with Castro.
At the end of the day, this is a fact-specific inquiry. The jury heard evidence that Gonzalez presented a sufficient threat to cause him to be supervised by two officers at all times following his arrest, one of whom was consistently in contact with him. They also heard that, pursuant to jail policy, combative inmates such as Gonzalez were to be housed separately from inmates like Castro, specifically to avoid this type of altercation. The jury was further informed that separate cells were available but left unused that evening.
This evidence was sufficient to allow the jury to find that Valentine knew of but disregarded a substantial risk of serious harm to Castro, and we find no reason to disturb that finding. See id. at 459 (“[P]ost-verdict, a court must apply the qualified immunity framework to the facts that the jury found (including the defendant’s subjective intent).”). Such a conclusion does not run afoul of this court’s holding in Ford because of the key factual differences between the two cases.
As with Solomon, the final question then becomes whether Valentine’s actions were both an actual and a proximate cause of Castro’s harm. The jury determined that they were and, for the reasons discussed above, we will not set aside that determination. Valentine is therefore not entitled to qualified immunity and may be subjected to liability for his personal involvement in the decision to house Gonzalez and Castro together.
C. For the purpose of awarding punitive damages, no additional evidence is required to make a finding of “reckless disregard” when a finding of “deliberate indifference” has been made
The individual defendants cursorily argue that the district court’s award of punitive damages must be reversed because the evidence does not support such an award. Although the parties stipulated to the eventual amount of the punitive damages entered ($12,000 against Valentine and $6,000 against Solomon), the defendants argued in both their pre- and post-verdict motions for judgment as a matter of law that there was insufficient evidence to support . a punitive-damages award. Castro counters that, after hearing the officers testify, the jury might have determined that they demonstrated callousness by their lack of remorse.
Punitive damages may be assessed in § 1983 actions “when the defendant’s conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.” Smith v. Wade, 461 U.S: 30, 56,103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). “[T]his threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness,” id., because to award punitive damages, the jury must make both a factual determination that the threshold was met and “a moral judgment” that further punishment was warranted, id. at 52-53 (recognizing that where the underlying standard of liability is recklessness, a tortfeasor may be subject to both compensatory and punitive damages without any addi *350 tional culpable conduct). The decision to impose such sanctions is “within the exclusive province of the jury.” Runge v. Lee, 441 F.2d 579, 584 (9th Cir.1971).
The precise distinction between “deliberate indifference” and “reckless or callous indifference” remains an open question. As discussed above, “deliberate indifference” is defined in this circuit as “the conscious choice to disregard the consequences of one’s acts or. omissions.” See 9th Cir. Civ. Jury Instr. 9.7 (2007). Furthermore, when the Supreme Court articulated the deliberate-indifference standard for failure-to-protect claims in Farmer, it defined the standard as one of criminal recklessness. See Farmer, 511 U.S. at 837-39, 114 S.Ct. 1970. The circular nature of these definitions gives rise to the inference that the terms are synonymous. Juries in these cases thus have the discretion to impose punitive damages if they believe further punishment above and beyond compensatory damages is appropriate, without having to make any additional factual findings. See Smith, 461 U.S. at 56, 103 S.Ct. 1625.
As described above, the jury heard sufficient evidence here to find that both individual defendants were deliberately indifferent. Accordingly, it was also free to find that the individual defendants’ actions constituted reckless or callous indifference, opening up the possibility of punitive damages. The jury rendered such a judgment here. Because this decision is “within the exclusive province of the jury” so long as the legal prerequisites are met, we will allow the lower court’s punitive-damage award to stand. See Runge, 441 F.2d at 584.
D. Castro’s Monell claim is legally viable but insufficiently proven
We turn next to the issues raised by the County in this appeal. The County argues that the verdict against it should be reversed for the following three reasons: (1) the Eleventh Amendment bars a finding of liability; (2) if Castro’s theory of liability is based on the County’s having an informal policy that violated his constitutional rights, then his theory fails because there was no evidence presented of any similar prior incidents; and (3) if Castro’s theory of liability is based on the County’s having a formal policy that violated his constitutional rights, then his theory is legally untenable.
We begin our analysis by addressing a few fundamental points regarding municipal liability under 42 U.S.C. § 1983. . The first point is that although § 1983 imposes liability only on “persons” who, under color of law, deprive others of their constitutional rights, the Supreme Court has construed the term “persons” to include municipalities such as the County. See Monell v. Dep’t of Soc. Servs., 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A municipality is responsible for a constitutional violation, however, only when an “action [taken] pursuant to [an] official municipal policy of some nature” caused the violation. Id. at 691, 98 S.Ct. 2018. This means that a municipality is not liable under § 1983 based on the common-law tort theory of respondeat superior. Id. On the other hand, the official municipal policy in question may be either formal or informal. City of St. Louis v. Praprotnik, 485 U.S. 112, 131, 108 S.Ct. 915, 99 L.Ed.2d 107 (1989) (plurality opinion) (acknowledging that a plaintiff could show that “a municipality’s actual policies were different from the ones that had been announced”); id. at 138, 108 S.Ct. 915 (Brennan, J., concurring) (stating that municipal policies may be formal or informal).
A formal policy exists when “a deliberate choice to follow a course of ac *351 tion is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.” Pembaur v. City of Cincinnati, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality opinion). When pursuing a Monell claim stemming from a formal policy, a plaintiff must prove that the municipality “acted with the state of mind required to prove the underlying violation.” Tsao v. Desert Palace, Inc., 698 F.3d 1128,1143-44 (9th Cir.2012) (internal quotation marks omitted) (explaining that the plaintiff must prove that'the municipal defendants acted with deliberate indifference, the same standard that a plaintiff has to establish in a § 1983 claim against an individual defendant).
An informal policy, on the other hand, exists when a plaintiff can prove the existence of a widespread practice that, although not authorized by an ordinance or an express municipal policy, is “so permanent and well settled as to constitute a custom or usage with the force of law.” Praprotnik, 485 U.S. at 127, 108 S.Ct. 915 (internal quotation marks omitted). Such a practice, however, cannot ordinarily be established by a single constitutional deprivation, a random act, or an isolated event. Christie v. Iopa, 176 F.3d 1231, 1235 (9th Cir.1999). Instead, a plaintiff such as Castro must show a pattern of similar incidents in order for the factfinder to conclude that the alleged informal policy was “so permanent and well settled” as to carry the force of law. See Praprotnik, 485 U.S. at 127,108 S.Ct. 915.
The County’s first two arguments can be quickly and easily addressed. First, the claim that the County is protected from suit by the Eleventh Amendment was squarely considered and rejected by this court in Jackson v. Barnes, 749 F.3d 755, 764-65 (9th Cir.2014), cert. denied, — U.S. -, 135 S.Ct. 980, 190 L.Ed.2d 835 (2015) (holding that a sheriffs department is a county actor when it investigates crime and supervises a jail, and thus is not protected by the Eleventh Amendment’s blanket of immunity for state officials). The County therefore cannot seek refuge behind the Eleventh Amendment. Second, and in the County’s favor, the record is devoid of any similar incident to that suffered by Castro. He thus failed to establish that the County had an informal policy in relation to the sobering cell that caused him harm. The County’s liability thus hinges on its final argument, which boils down to (1) whether the design of the sobering cell constitutes a formal County policy and, if so, (2) whether the County was deliberately indifferent to the harm that befell Castro as a result of that formal policy.

1. The jail’s design was a deliberate choice by the County and thus a formal policy

We cannot envision how a municipality can design a jail without making “a deliberate choice ... from among various alternatives.” See Pembaur, 475 U.S. at 483, 106 S.Ct. 1292. Construction projects of any variety involve a series of such choices based on aesthetics, functionality, budget, and other factors. One would assume that for any given construction project, including jails, the municipality’s governing body — or a committee that it appoints to act in its stead — reviews bids, considers designs, and ultimately approves a plan for the facility and allocates funds for its construction. These choices are sufficient, in our opinion, to meet the definition of a formal municipal policy as set forth in Pembaur.
We are unpersuaded by the cases cited by the County in support of its argument to the contrary. See Molton v. City of Cleveland, 839 F.2d 240, 246 (6th. Cir. 1988); Elliott v. Cheshire Cnty., 750 F.Supp. 1146, 1156 (D.N.H.1990), aff'd in *352 part and vacated in part, 940 F.2d 7 (1st Cir.1991); Shouse v. Daviess Cnty., No. 4:06-cv-144-M, 2009 WL 424978, at *8 (W.D.Ky. Feb. 19, 2009) (unpublished); Richardson v. Dailey, No. 925996, 1994 WL 879488, at *3 (Mass.Super.Ct. Sept. 29, 1994) (unpublished), aff'd, 424 Mass. 258, 675 N.E.2d 787 (1997). Of these cases, Molton is the only one to provide more than a cursory analysis of the jail-design-as-policy issue.
In Molton, an inmate hung himself by his shirt in his cell while his fellow inmates screamed for help. 839 F.2d at 242-43. The administrator of the decedent’s estate sued the city under § 1983, alleging that the jail was defectively designed, creating a substantial risk of suicides. Id. at 243. The jury returned a verdict in favor of the estate. Id. On appeal, the city argued that the estate had failed to prove the existence of a municipal policy that caused the suicide. Id. at 247. The estate responded by pointing out several factors contributing to his injury that were “inherently matters of city policy,” including the operation of a jail with a cell block that was too remote for easy supervision, the failure to install an audio communication system between the cell block and the office area, and the failure to modify cell architecture to make suicides less likely. Molton, 839 F.2d at 246.
In ruling against the estate, the Sixth Circuit found two problems with the estate’s argument: (1) Supreme Court case-law requires a plaintiff to identify a “deliberate and discernible city policy” rather than a series of vague issues with the way the city runs its jail, and (2) the evidence produced by the estate supported, at most, a finding that the city acted negligently in designing the jail. Id. The court in Molton concluded that the city’s “failure to build a suicide-proof jail cell” did not constitute “a deliberate choice to follow a course of action” that would be required to impose Monell liability. Id. (internal quotation marks omitted). Elliott, Shouse, and Richardson relied on Molton in reaching similar conclusions.
Molton, however, did not address the series of deliberate choices made by the city that went into the design of the jail itself. See id. The Sixth Circuit instead considered the “deliberate choice” question only with regard to whether the design was deliberately indifferent to a risk to the inmates (as opposed to whether the design was simply negligent). Id.
To the contrary, we conclude that the question of whether the design of a jail can lead to a constitutional violation (i.e., whether it constituted deliberate indifference on the part of the municipality) is a separate question from the issue of whether the design can be considered a formal policy for Monell purposes (i.e., whether the design was a deliberate choice made by a policymaker among a series of alternatives). With all due respect to our sister circuit, we cannot ignore the plethora of deliberate choices that a municipality makes in designing a jail, and we conclude that those choices render the design a formal municipal policy for the purpose of Monell liability.
The design of a jail, in sum, is the result of a series of deliberate choices made by the municipality that built it. In this case, the County does not contest that it was responsible for the design and operation of the West Hollywood Station. We therefore hold that the County instituted a formal policy under Monell with regard to the jail’s sobering cell.

2. To ftnd that a municipality was deliberately indifferent to a risk, a plaintiff must prove that the municipality had actual knowledye of that risk

Having determined that the County’s design of the West Hollywood Station’s *353 sobering cell constituted a formal municipal policy, we turn next to the issue of whether that policy violated Castro’s constitutional rights. Castro alleged that the County’s policy deprived him of the same constitutional right that was violated by the individual defendants — his right to be free from violence at the hands of other inmates. As with the individual defendants, Castro must demonstrate that (1) he faced a substantial risk of serious harm, (2) the County, knowing of the risk, showed deliberate indifference by failing to take reasonable corrective measures, and (3) the County’s failure to mitigate the risk was a proximate cause of the harm that he suffered. See Farmer, 511 U.S. at 828, 842,114 S.Ct. 1970.
The critical question in this case is whether the County had knowledge of the risk. At trial, Castro presented evidence establishing that the state of California had in place a regulation aimed at preventing the very type of harm suffered by Castro. Title 24 of California’s Minimum Standards for Local Detention Facilities defines a “sobering cell” as “afi initial ‘sobering up’ place for arrestees who are sufficiently intoxicated from any substance to require a protected environment to prevent injury by falling or victimization by other inmates.” Cal.Code Regs. tit. 15, § 1006 (emphasis added). In addition, California’s Minimum Standards for Adult Detention Facilities provides that “there shall be an inmate- or sound-actuated audio monitoring system in ... sobering cells ... which is capable of alerting personnel who can respond immediately.” Id. tit. 24, § 1231.2.22 (emphasis added).
The plain text of this regulation clearly indicates that the state regulators were concerned about inmate-on-inmate violence and required counties to install a compliant audio-monitoring system in order to ensure that the inmates could easily summon help. West Hollywood Station’s sobering cell did not have such an audio-monitoring system in place.
Castro argues that, because of the regulation, the County knew of the risk that inmates in a sobering cell face from other inmates but disregarded that risk by failing to take the precautions required by the regulations. The County, on the other hand, argues that there was no evidence presented at trial establishing that it was aware of the regulation. In the absence of such evidence, the County contends that no reasonable jury could have concluded that it knew of the risk to Castro.
Both sides have muddled the issue of knowledge by failing to distinguish between actual and constructive knowledge. The courts have long recognized a critical distinction between the knowledge that a reasonable person should have had in a given situation and the knowledge that a particular defendant did in fact have in the same situation. See, e.g., Han v. United States, 944 F.2d 526, 530 (9th Cir.1991) (reversing the grant of summary judgment in favor of the IRS because the taxpayer had only constructive knowledge rather than actual knowledge of a lien on his property); McGinn v. City of Omaha, 217 Neb. 579, 352 N.W.2d 545, 547 (1984) (per curiam) (holding that a city could be held liable for personal injuries sustained as a result of its negligence, even in the absence of actual knowledge, if it had the knowledge that a reasonable person would have possessed under the circumstances). Constructive knowledge is an objective standard, see Rost v. United States, 803 F.2d 448, 451 (9th Cir.1986), whereas actual knowledge is a subjective standard, see Bus. Guides, Inc. v. Chromatic Commc’ns Enterps., Inc., 892 F.2d 802, 810 (9th Cir. 1989), aff'd, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).
*354 We fully agree with Castro that a municipality should be aware of (and abide by) applicable state regulations governing its conduct. Although the Supreme Court has concluded that individual officers are not deemed to have knowledge of the “voluminous, ambiguous, and contradictory” regulations governing their on-the-job conduct, Davis v. Scherer, 468 U.S. 183, 196, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984), the reasoning behind that conclusion does not apply to municipalities with equal force. The Davis Court was concerned with protecting officers who “must often act swiftly and firmly,” without the time or luxury for “an extensive inquiry into ... the applicability and importance of the rule at issue” and “the possible legal consequences of their conduct.” Id. at 195-96, 104 S.Ct. 3012.
A municipality’s decision-making process will, in contrast, rarely if ever be so time-sensitive or pressured. Expecting municipal entities to take the time to become aware of applicable state regulations is essential to effective governance. See Cannon v. Univ. of Chi., 441 U.S. 677, 696-97, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (“It is always appropriate to assume that our elected'representatives, like other citizens, know the law[.]”). The County may therefore be deemed to have constructive knowledge of the risk that Castro faced in this case because there was a state regulation in effect that clearly iden- • tilled the risk and required certain steps to mitigate the potential for danger.
Under Farmer, however, the constructive-knowledge standard, based on an objective look at what a reasonable person should have known, is insufficient to support a finding of deliberate indifference. The Court specifically rejected such a test for knowledge of a risk under the Eighth Amendment, opting instead for an inquiry into the subjective state of mind of the defendant. Farmer, 511 U.S. at 838, 114 S.Ct. 1970.
In order to be deemed “deliberately indifferent,” the Court concluded that an official “must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.” Id. at 837, 114 S.Ct. 1970. In other words, “an .official’s failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.’’ Id. at 838, 114 S.Ct. 1970. The same reasoning applies to a municipality.
Farmer recognized that “conceptual difficulties may] attend any search for the subjective state of mind of a governmental entity,” id. at 841, 114 S.Ct. 1970, but these difficulties are not insurmountable. A plaintiff could take any of several paths to prove that a municipality had actual knowledge of a substantial risk of serious harm to inmates. For example, where, as here, there is an applicable regulation that should have put the municipality on notice of the risk, a plaintiff could offer evidence that the municipality had been notified that it was out of compliance with the regulation. Other evidence, such as meeting minutes or other records, that the regulation was discussed at planning meetings would also suffice, as would evidence that similar' incidents had occurred and been brought to the municipality’s attention. Regardless of its form, however, some evidence of actual knowledge is required to find that a municipality had the requisite “consciousness of a risk” to be held deliberately indifferent. Id. at 840, 114 S.Ct. 1970.
No such evidence was presented in this case. As the County points out, the only evidence proffered by Castro to establish that the County knew of the risk to *355 Castro’s safety was the existence of the state regulation. But this evidence, for the reasons discussed above, establishes only constructive knowledge on the part of the County. Per Castro’s own brief, he decided for “tactical reasons” not to present evidence of similar incidents in the past, and he offered no evidence that the regulation in question had ever been specifically brought to the County’s attention.
Nor are we persuaded by our dissenting colleague’s argument that the County Council’s wholesale adoption of numerous chapters of the California Building Code, one of which contains the state regulation in question, “provides even more evidence that the county knew of that risk.” Dissenting op. at 358. In the absence of any proof that this particular regulation was ever brought to the attention of a County policymaker with authority over the jail, the fact that no one found this proverbial “needle in a haystack” simply confirms our view that we are dealing with constructive knowledge rather than actual knowledge on the part of the County.
The question of what constitutes deliberate indifference is one of fact, such that we generally owe the jury’s conclusion substantial deference. Grenning v. Miller-Stout, 739 F.3d 1235, 1239 (9th Cir.2014) (citing Johnson v. Lewis, 217 F.3d 726, 734 (9th Cir.2000)). But without any evidence whatsoever that the County had actual knowledge of the risk to Castro’s safety, the verdict against the County cannot stand.
E. Castro presented sufficient evidence regarding the amount of his past damages from which the jury could reasonably calculate the amount of future damages
The defendants’ final argument is that the jury’s future-damages award of $600,000 should be reversed because it was based on pure speculation as to the amount of such damages. We find this argument to be without merit.
The parties agree that California law applies for purposes of calculating damages in this case. See Sullivan v. Little Hunting Park, Inc., 396 U.S. 229, 256, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (directing lower courts to “look to state law to find appropriate remedies when the applicable federal civil rights law is ‘deficient in the provisions necessary to furnish suitable remedies’” (quoting 42 U.S.C. § 1988(a))). Under California law, an award of damages may include an amount to compensate for related expenses that are “certain to result in the future.” Cal. Civ.Code § 3283. “However, the ‘requirement of certainty •... cannot be strictly applied where prospective damages are sought, because probabilities are really the basis for the award.’ ” Behr v. Redmond, 193 Cal.App.4th 517, 123 Cal.Rptr.3d 97, 111 (2011), as modified Mar. 25, 2011 (quoting 6 Witkin, Summary of Cal. Law Torts, § 1552 (10th ed.2005)).
The defendants’ repeated assertions that Castro has “set forth no admissible evidence to establish any foundation whatsoever for the amount of future expenses” are simply not supported by the record. Castro submitted the billing records from both his cognitive assistant and his treating psychologist, and he also submitted a chart detailing the charges for the almost $1 million in medical expenses that he had already incurred. He also proffered several medical experts who testified to his need for ongoing medical care and described the approximate scope of that care.
California courts have consistently approved damage awards for future medical expenses based on this type of evidence. See, e.g., id. at 113 (approving a future-damages award based on the cost of a *356 ■ medication as established by past records multiplied by the plaintiffs estimated life span); Cooper v. Chambi, No. G028318, 2002 WL 31086128, at *3 (Cal.Ct.App. Sept. 9, 2002) (unpublished) (finding that past bills for psychological services totaling $125 per week could provide a jury with reasonable certainty as to the future cost of psychological services, but could not alone sustain a $1.5 million future-damages award).
The defendants also object to the future-damages award because they argue that it was not reduced to present value. They have a point to the extent that such an award is subject to a present-value reduction. See Fox v. Pac. Sw. Airlines, 133 Cal.App.3d 565, 184 Cal.Rptr. 87, 89 (1982) (holding that “recovery for lost future benefits must be discounted to present value”) (citing Bond v. United R.R.s of S.F., 159 Cal. 270, 113 P. 366, 372 (1911)). But they overstate the role of experts in establishing the appropriate discount. The California Civil Jury Instruction that they cite simply states that expert testimony is “usually” required to accurately establish present values, and Niles v. City of San Rafael, 42 Cal.App.3d 230, 116 Cal. Rptr. 733, 740 (1974), on which they rely, similarly observes that actuarial testimony is “frequently” used for this purpose.
However common the use of experts may be, ho California court has ever held that expert testimony is an absolute requirement in order to establish the present value of a future-damages award. The district court instructed the jury to reduce its award of future damages to present value according to the Ninth Circuit’s Model Civil Jury Instructions, and we have no reason to believe that the jury ignored that instruction, particularly because the jury awarded only slightly more than half of the amount requested.
In sum, although no expert testified as to the precise rate of reduction to be applied, the court instructed the jury to reduce its award for future damages to present value, and “we must assume that the jury followed the court’s instructions.” See Gray v. Shell Oil Co., 469 F.2d 742, 752 (9th Cir.1972). Our assumption seems fully justified by the fact that the future damages awarded to Castro reflected a 42 percent discount from the amount requested. Particularly in light of this discount, we are not persuaded that this is the appropriate case in which to make the use of experts to establish the present value of future damages an absolute requirement under California law. We therefore decline to disturb the award for future damages.
III. CONCLUSION
For all the reasons set forth above, we AFFIRM the judgment of the district court against the individual defendants but REVERSE the judgment against the County. Each party shall bear its own costs.